Filed 2/6/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of DOROTHY and JOSEPH CIPRARI. | B272039, B278187 |
| | (Los Angeles County Super. Ct. No. BD530229) |
| DOROTHY CIPRARI, | |
| Appellant, | |
| v. | |
| JOSEPH CIPRARI, | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Juhas, Judge.  Affirmed in part; reversed in part, and remanded with directions.

California Appellate Law Group, Sarah K. Hofstadter, Robert A. Roth, and Kelly Woodruff for Appellant.

 Elkins Kalt Weintraub Reuben Gartside and Thomas P. Dunlap for respondent.

—————————————————

# INTRODUCTION

Dorothy ("DeeDee") and Joseph ("Joe") Ciprari married on September 16, 1995.[1] The trial court fixed the date of separation as August 13, 2010, the date DeeDee commenced this marital dissolution proceeding. The marriage terminated pursuant to a judgment entered March 18, 2016, which attached the court's final statement of decision.

On appeal from that judgment, DeeDee principally challenges the trial court's characterization of a majority of the cash and securities held in commingled accounts as Joe's separate property. As discussed more fully below, she attacks a detailed tracing analysis performed by Joe's expert witness, upon which the trial court relied. We conclude the tracing is valid and constitutes substantial evidence in support of the judgment.

DeeDee also challenges the trial court's findings that Joe did not breach fiduciary duties when he used community property funds to establish an irrevocable life insurance trust for the benefit of Marie and Molly, and to fund tax-advantaged Internal Revenue Code section 529 college savings accounts (529 accounts) for the two girls. We conclude these findings also are supported by substantial evidence.

---

[1] We refer to the parties and their children, Marie (born June 1998) and Molly (born November 2001), by their first names only, for the sake of clarity and brevity.

In addition, DeeDee seeks to overturn the trial court's temporary and permanent child and spousal support awards.[2] We affirm that part of the judgment awarding permanent child support, and the trial court's temporary child and spousal support awards for two periods in 2015. But, we hold the trial court abused its discretion when it retrospectively modified 2014 pendente lite child and spousal support, because it based the modification on the parties' 2013 tax returns, rather than their 2014 tax returns, which were then available. We reverse that part of the judgment, and remand for the limited purpose of recalculating the 2014 awards in light of the 2014 tax returns. We also reverse the permanent spousal support award and remand for recalculation of that amount as well.

Finally, in a second, consolidated appeal, DeeDee contends the trial court erred in denying her an award of additional attorneys' fees. We reverse that postjudgment order.

## DISCUSSION

### I. Characterization of Assets.

The parties stipulated Joe entered the marriage with $2,053,573 of separate property. Of that amount, $873,953 was held in two Wells Fargo Bank accounts. The trial court found the money held in the bank accounts was "essentially 'gifted' to the community," a finding neither party contests. (See *See v. See* (1966) 64 Cal. 2d 778, 785 [In the absence of an agreement to the

---

[2] As is customary, we use the word "permanent" to refer to postjudgment child and spousal support, even though such awards may be modified, have limited duration, or be terminated.

3

contrary, the use of separate property to meet community living expenses is a gift to the community.].)

On the date of the parties' marriage, Joe held the balance of his separate property ($1,179,620) in a brokerage account at PaineWebber. As is typical, the brokerage account had a cash component and an investment component. The account held $295,856 in cash and securities then valued at $883,764.[3]

In February 1996, Joe received a $244,696 bonus from his employer for work performed during the prior year. Because the parties had married during 1995, the bonus was partly separate property and partly community property. Nevertheless, Joe deposited the entire amount in his PaineWebber brokerage account. This was the first time that community and separate funds became commingled in the account. But it was far from the last. Throughout the marriage, Joe indiscriminately deposited portions of his salary (which was community property) into the PaineWebber account[4] and other commingled investment accounts he later opened. By the end of 2014, the combined balances in these commingled investment accounts equaled $6,910,568.

How much, if any, of that sum was Joe's separate property, and how much was community property, is known as a "characterization" issue, and is the central issue in this case. "Characterization . . . refers to the process of classifying property as separate, community, or quasi-community." (*In re Marriage of*

---

[3] DeeDee's separate property amounts are not at issue.

[4] The PaineWebber account became a UBS account after UBS acquired PaineWebber.

4

*Haines* (1995) 33 Cal.App.4th 277, 291 (*Haines*), disapproved on another point in *In re Marriage of Valli* (2014) 58 Cal.4th 1396.) It "is an integral part of the division of property on marital dissolution." (*Ibid.*)

Family Code section 760[5] states the basic presumption that, except as otherwise provided by statute, all property acquired by a married person during marriage, while domiciled in California, is community property. Each spouse has a "present, existing and equal" interest in the community property. (§ 751.) On the other hand, property acquired before marriage, or after separation, or at any time by gift, bequest, devise, or descent, is separate property. (§§ 770, subd. (a), 771). And the "rents, issues, and profits" of separate property also are separate property, whether earned before, during, or after marriage. (§ 770, subd. (a)(3).) "Except as otherwise provided by statute, neither spouse has any interest in the separate property of the other." (§ 752.)

"Thus, there is a general presumption that property acquired during marriage by either spouse other than by gift or inheritance is community property unless traceable to a separate property source. [Citation.] This is a rebuttable presumption affecting the burden of proof; hence it can be overcome by the party contesting community property status. [Citation.] Since this general community property presumption is not a title presumption,[6] virtually any credible evidence may be used to

---

[5] Further statutory references are to the Family Code unless otherwise indicated.

[6] Joe opened all the investment accounts in his name only, so no joint title presumptions are relevant.

overcome it, including tracing the asset to a separate property source, showing an agreement or clear understanding between the parties regarding ownership status and presenting evidence the item was acquired as a gift." (*Haines, supra,* 33 Cal.App.4th at pp. 289−290, fn. omitted); *In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411, 1423 (*Bonvino*); see *also See v. See, supra,* 64 Cal.2d 778, 783; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2018) ¶¶ 8:361 8:363, pp. 8-137−8-139 (Hogoboom & King).)

"Of course, mere commingling of separate property and community property funds does not alter the status of the respective property interests, provided that the components of the commingled mass can be adequately traced to their separate property and community property sources. But if the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled funds will be deemed community property pursuant to the general community property presumption of section 760." (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 822−823 (*Braud*); see also *In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057 (*Cochran*); *Bonvino, supra,* 241 Cal.App.4th at p. 1423.)

### A. Joe's Tracing

At trial, Joe's forensic accountant testified he had conducted a detailed and comprehensive tracing of all the accounts, analyzing every transaction, including all deposits, purchases, payments of interest or dividends, transfers, and withdrawals. Although the tracing was lengthy and detailed— listing approximately 17,000 account entries in 23 accounts over

almost 20 years, and consisting (along with various schedules) of 547 pages—it employed straightforward and readily understandable methods.

Joe's accountant first gathered and reviewed all brokerage statements for each account, so he could list and analyze all transactions. For each account, he determined whether each deposit or transfer into the account was separate property or community property (or some combination). If unknown, he treated the funds deposited as community property. Consistent with section 760's presumption that assets acquired during marriage are community property, Joe's accountant characterized all purchases of securities as community property, to the extent community property funds were available in the cash portion of the account to make the purchase. (See *In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1010 ["Where funds are paid from a commingled account, the presumption is that the funds are community funds."].) Only when the community funds in the cash portion of the account were exhausted did he characterize an investment as separate property. If some community property cash remained in an account, but was insufficient to purchase the entirety of the securities acquired, he characterized the investment as part community and part separate property, in proportion to the amount of each used to purchase the investment. If he characterized the investment as, for example, 65 percent community property and 35 percent separate property, he allocated any interest or dividends from that investment using the same ratio. When and if the asset was sold, he divided the proceeds in the same ratio. If the proceeds were used for subsequent investments, Joe's accountant traced them in

the same manner. He used the same process to trace and characterize all assets in all accounts.

The bottom line is the community was credited with any securities purchased in an account to the extent that community funds were available in that account for their purchase. To the extent community funds were not available in the account at the time an asset was purchased, the asset was characterized as separate property. And the community received the benefit of any investment, including dividends, interest, and the sale proceeds, to the same extent it owned the asset.

Cash withdrawals, which are discussed further below, were deposited in the couple's community bank accounts, or—after separation—into an account Joe opened in his name. The withdrawals were treated by Joe's accountant as community property and there is no evidence that the proceeds were used for any purpose other than family living expenses or community investments other than securities.

Joe's accountant concluded that, at the end of 2014, the combined account balance in the investment accounts was approximately $6.9 million, of which $3,791,653 was Joe's separate property and $3,118, 916 was community property.[7]

The trial court ruled Joe's tracing "is an appropriate tracing" and Joe carried his burden of proof to trace his separate

---

[7] Joe's accountant corrected his tracing to revise the treatment of certain GE stock. The trial court found the accountant's method of accounting for the GM stock and dividends was acceptable, and did not invalidate the tracing. DeeDee does not challenge this adjustment on appeal, beyond her challenge to the tracing itself.

8

property through the commingled accounts. The trial court also adopted the findings contained in the tracing and associated schedules.

Before trial, through one or more stipulations and/or stipulated orders, the parties divided approximately $6.9 million of assets and additional funds were frozen. They also agreed to temporary child and spousal support payments without prejudice to retroactive adjustment after trial. Joe's accountant prepared a reconciliation and reimbursement schedule indicating how the previously allocated assets should be reallocated based on his tracing. The trial court adopted it and attached it to the judgment. DeeDee does not challenge the mathematics of the reconciliation, just the tracing on which it was based.

The net result, including proceeds from sale of the family residence, was that Joe exited the marriage with total assets of $10,620,363, while DeeDee received $5,250,231.

## B. Standard of Review and Applicable Law

On appeal, we presume the judgment is correct. " 'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown' " by the appellant. (*Denham v. Superior Court (Marsh & Kidder)* (1970) 2 Cal.3d 557, 564.) "In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]' [Citation.] In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every

9

reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]'  [Citation.]  We may not reweigh the evidence and are bound by the trial court's credibility determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment." (*Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.)

"The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial." (*SFPP v. Burlington N. & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.)  "The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380.)  " 'Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.' " (*In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 342.)

A party may avoid implied findings in favor of a judgment, and preserve perceived error in a statement of decision, by making specific objections to the statement of decision.  Code of Civil Procedure sections 632 and 634 prescribe a two-step process for doing so.  "[F]irst, a party must request a statement of decision as to specific issues . . . ; second, if the court issues such a statement, a party claiming deficiencies therein must bring such defects to the trial court's attention to avoid implied findings on appeal favorable to the judgment." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134.)

10

Here, after the trial judge announced his tentative decision, DeeDee filed a request for a statement of decision on certain identified issues, and following the issuance of the court's statement of decision, filed objections thereto. The impact of those filings, if any, will be discussed below.

"The presumption that all property acquired by either spouse during the marriage is community property may be overcome. [Citations.] Whether or not the presumption is overcome is a question of fact for the trial court." (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 611−612 (*Mix*).) " 'Where funds are paid from a commingled account, the presumption is that the funds are community funds. [Citations.] In order to overcome this presumption, a party must trace the funds expended to a separate property source. [Citation.] This issue presents a question of fact for the trial court and its finding will be upheld if supported by substantial evidence.' " (*In re Marriage of Higinbotham* (1988) 203 Cal App.3d 322, 328; see also, *Braud, supra*, 45 Cal.App.4th at pp. 822−823; *Cochran, supra*, 87 Cal.App.4th at pp. 1057−1058.)

As discussed below, DeeDee argues California law permits only two methods of tracing to overcome the presumption that property acquired during marriage is community property: "direct tracing" and "exhaustion tracing." She contends that "[t]he trial court's adoption of a tracing method that failed to meet the requirements of either established standard was erroneous as a matter of law." Because this is a legal issue, or a mixed question of law and fact, in which the legal issue predominates, we review it *de novo*. (See *In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734.)

11

## C. The Trial Court Did Not Err by Adopting Joe's Tracing

DeeDee doesn't dispute *any* of the factual elements of the tracing prepared by Joe's accountant. As she says in her reply brief, "Here, there simply are no material contested facts." Instead, she contends the tracing is invalid as a matter of law because (1) it differs from what she asserts are the two "exclusive" methods of tracing under California law: direct tracing and exhaustion tracing; (2) Joe did not prove he *intended* to use separate property funds to purchase any particular asset; and (3) Joe's accountant assumed assets were purchased with separate property funds whenever no community funds were available in the account in question, but Joe did not prove that community funds were not available in some *other* account. We disagree with her conclusion that Joe's tracing method was invalid as a matter of law.

DeeDee correctly notes that previous reported cases have described two tracing methods:

1. "Direct tracing" can be used to demonstrate a spouse's separate property was used to purchase an asset, even though the purchase is made with funds from a commingled account containing both separate and community property. It requires (a) documentary proof that sufficient separate property funds were available in the account at the time of purchase; and (b) proof that the spouse making the purchase intended to use separate, rather than community, funds. (See, *e.g.*, *Mix, supra*, 14 Cal.3d at p. 612; *In re Marriage of Frick, supra*, 181 Cal.App.3d at pp. 1011−1012.)

2. "Exhaustion tracing" is sometimes also called "Recapitulation," "Family expense," "Family living expense," or "Family income exhaustion" tracing. Whatever the name, it attempts to trace a payment or purchase from a commingled mass to separate property funds by process of elimination; *i.e.*, by showing that—because *all* community property funds were exhausted at the time the purchase or payment at issue was made—separate property funds necessarily must have been used. (*See v. See*, *supra*, 64 Cal.2d at p. 783.) This approach presumes that available community property funds are used for family expenses before separate property funds are used for that purpose. (See, *e.g., Marriage of Frick*, *supra*, 181 Cal.App.3d at p. 1018, fn. 11.)

As discussed below, we disagree with DeeDee's assertion that Joe's tracing method is wholly unprecedented. But even if, as DeeDee asserts, the two methods described above were the only ones previously described in the reported cases, that would not mean—as DeeDee repeatedly asserts—that they are the only methods permissible under California law. DeeDee cites no authority, and we are aware of none, holding that California law precludes trial courts from relying on any tracing method other than the two just described.

The closest she comes is her citation of a passage from *In re Marriage of Stoll* (1998) 63 Cal.App.4th 837, 841 (*Stoll*): "It is hornbook California family law that tracing is done either directly, or by a process of elimination whereby a spouse shows the exhaustion of available community funds at the time of acquisition." She also cites *Mix*, *supra*, 14 Cal.3d 604, 612, which employs similar language: "post-marital property can be established to be separate property by two independent methods

13

of tracing.  The first method involves direct tracing . . . .  The second method involves consideration of family expenses."

The leading treatise currently says, "*Generally*, either of two tracing methods may be used to characterize disputed property interests—'*direct tracing*' or '*family living expense tracing*.' "  (Hogoboom & King, *supra*, ¶ 8:526 at p. 8-200, first italics added.)  But it does not say use of other methods is prohibited. And neither *Stoll* nor *Mix* prohibits variations in tracing methods to account for varied factual scenarios.  These courts simply did not consider the propriety of any alternative tracing method, including Joe's method.  The issue was not before them.

We see no reason to straightjacket trial courts by adopting DeeDee's prohibition of tracing methods other than the two she identifies.  Tracing is simply a method of proof.  As noted above, trial courts have the flexibility to consider any credible evidence and to evaluate alternative tracing methods to determine whether the proponent of the tracing carries his or her burden of proof.  The tracing method may vary depending on the facts.  Thus, trial courts are free to consider and credit reasonable, well-supported, and nonspeculative expert testimony, when determining whether the proponent has successfully traced commingled assets to a separate property source.  (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 753, 771−772.)

Moreover, in reality, Joe's method of tracing separate property to, and characterizing the activity within, a particular commingled account is *not* unprecedented.  In *Cochran, supra*, 87 Cal.App.4th 1050, a husband sought to trace his separate

14

property funds paid out of a commingled bank account. The husband deposited $77,395.14 from his profit-sharing plan into a bank account. (*Id*. at pp. 1054−1055.) Because these funds were part community and part separate property, the account was commingled. At the time of the deposit, $43,061.24 was separate property and $34,405.51 was community property. (*Id*. at p. 1055.) The husband then wrote three checks. The first, for $34,192.15, paid off the balance due on a community property debt. The court concluded, based on the presumption that community living expenses are paid out of community rather than separate property, and because this was the first expenditure, that community funds were used to pay this debt. (*Id*. at p. 1058.) Thus, the first check "exhausted the community property funds in the account, with the exception of $213." (*Id*. at p. 1054.)

The husband wrote a second check in the amount of $32,950 as earnest money for obtaining a loan for the family home (a community debt). "It can be presumed under the family expense presumption that the remaining $213 in community property funds was used first to pay for the subsequent home construction loan earnest money since the loan was for building the family home, a community asset." (*Cochran*, *supra*, 87 Cal.App.4th at pp. 1058−1059.)

The husband wrote a third check to pay certain fees required to obtain a building permit for the family home (also a community debt). (*Cochran*, *supra*, 87 Cal.App.4th at pp. 1058−1059.) The court concluded, by process of elimination (there being only $213 of community property funds left in the bank account), the husband's separate property funds were used

for all but $213 of the second and third payments, and he was entitled to reimbursement.  (*Id.* at p. 1058.)

The trial court knew Joe's tracing did not fit neatly into either of the two categories described above, and it combined some aspects of each.  And Joe's tracing was far more complicated than the tracing in *Cochran*.  Nevertheless, the trial court found the tracing was "appropriate," "sufficiently traced the accounts," and that "Respondent carried his burden of proof with respect to the marital tracing."

The trial court correctly concluded that, unlike in a traditional direct tracing, the presumption employed by Joe's accountant, that all investments were community property until no more community cash remained in the account, rendered Joe's intent irrelevant.  The tracing "gave" the investment opportunity first to the community, by characterizing all investments as community property whenever sufficient community property funds were available in the account to purchase the securities.  But, whenever the community property funds in an account had been exhausted, by process of elimination Joe's accountant characterized the remaining funds as separate property, because only separate property remained in the account.  Thus, he characterized investments made from those separate property funds as separate property.  This is consistent with *Cochran, supra*, 87 Cal.App.4th 1050.

DeeDee asserts Joe was required to demonstrate no community funds were available in *any* account before a purchase could be characterized as separate property, but that confuses the nature of Joe's tracing with a traditional "exhaustion" tracing.  The two are not the same, as the trial court

16

recognized, and their requirements differ. In this case, the commingled funds were in a number of separate, identifiable investment accounts. Joe had the burden to trace his separate property through each of those various accounts. That there may have been community funds available elsewhere—whether in another investment account or in one of the couple's community bank accounts—was irrelevant to the tracing because it would not have altered the characterization of the funds inside any given account. And unlike *community living expenses*, which are presumed to have been made with community funds if any such funds are available anywhere, *Cochran* teaches us there is no reason to presume an investment made from a commingled fund is a community asset if, through tracing, it can be demonstrated that all community funds in the account were exhausted before the investment was made.

Here, as reflected in the statement of decision, after considering the entirety of the evidence, the trial court found Joe carried his burden of proof with respect to the marital tracing and the court adopted Joe's tracing. We conclude substantial evidence supports the trial court's findings. The findings are consistent with the rule, discussed above, that separate property that has been commingled with community property does not lose its separate property status, so long as it can be traced back to a separate property source.

The statement of decision also contains the trial court's finding that "[t]he tracing proves that $3,791,653 of the remaining assets of the marital estate are [Joe's] separate property and that there are reimbursements due [Joe] in the amount of $1,389,288, for a total separate property due to [Joe] in the amount of $5,180,941." The trial court adopted Joe's

17

accountant's characterization of the parties' assets as of the date of separation, as reflected in exhibit E to the statement of decision, and his schedule of known assets/liabilities and proposed division as reflected in exhibit F. These findings also are supported by substantial evidence.

DeeDee raises three other issues relating to the tracing, none of which requires reversal.

First, she contends "every instance in which [Joe's accountant] characterized an investment as Joe's separate property when community funds held in other accounts were available . . . would constitute an 'appropriation of a partnership opportunity' and a mismanagement of the community assets that Joe was holding in trust for the community—a clear violation of Joe's fiduciary duties of loyalty and care" under section 721, subdivision (b).[8]

---

[8] Section 721, subdivision (b) provides:

"(b) Except as provided in Sections 143, 144, 146, 16040 and 16047 of the Probate Code, in transactions between themselves, spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Section 16403, 16404, and 16503 of the Corporations Code, including, but not limited to, the following:

But this argument lacks evidentiary support. DeeDee has pointed to no evidence demonstrating Joe's separate funds and the community were in competition for unique investment opportunities. The investment accounts contained primarily publicly traded stocks and bonds, available to all investors. (Joe also invested in real estate, but DeeDee does not cite to evidence in the record demonstrating the real estate was a particularly unique and advantageous opportunity). A married person is free to invest his or her separate property. (§ 770, subd. (b); *Somps v. Somps* (1967) 250 Cal.App.2d 328, 336 ["The fact that the husband purchased the . . . property with his separate funds, as the trial court found, is not evidence of taking undue advantage nor is it a breach of a fiduciary relationship which would invoke a presumption of fraud or undue influence."].) Nor has DeeDee cited evidence that would support a conclusion that Joe mismanaged community funds. On the contrary, she concedes that Joe's investments were quite successful. The trial court's

"(1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying.

"(2) Rendering upon request, true and full information of all things affecting any transaction that concerns the community property. Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions.

"(3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse that concerns the community property.

19

rejection of this breach of fiduciary duty claim is supported by substantial evidence.

Second, she objects that the tracing made no allocation to the community for the value of Joe's labor in managing his separate property investments. But she identifies no evidence in the record quantifying the amount of time Joe devoted to managing the investments, other than to point out he was otherwise unemployed for some period, nor does she cite any evidence offered by either party attempting to quantify the value of Joe's services. "An apportionment of profits" may be required when one spouse "invests separate funds in real estate or securities," but not when the spouse "expended only minimal effort and the [other spouse] introduced no evidence attributing a value" to the services. (*Estate of Neilson* (1962) 57 Cal.2d 733, 740.)

Finally, DeeDee objects to Joe's accountant's treatment of cash withdrawals—totaling over $1,000,000—from the traced accounts. With respect to cash withdrawals, the accountant debited the community's cash balance in the account first, only debiting Joe's separate property cash if there was insufficient cash to cover the withdrawal. DeeDee appears to concede that this treatment would be appropriate if the cash withdrawals were used for a family expense or community investment. But, she complains the tracing does not indicate the final use to which these particular withdrawals were put. And, she argues further, if the withdrawals were not used for community purposes, the ratio of separate to community property remaining in the account would be inaccurate, causing the tracing and characterization based on the tracing to also be inaccurate.

20

Her argument is a non sequitur.  Joe's accountant's treatment of the withdrawn cash as community property is wholly consistent with the basic rule that funds in a commingled account are community property unless successfully traced to a separate property source.  This is the same legal presumption upon which DeeDee stakes her claim to all of the assets in the investment accounts.  The rule does not change just because funds are withdrawn from an account.  (*Braud, supra*, 45 Cal.App.4th at pp. 822–823.)

If DeeDee had alleged and proved at trial that Joe had misappropriated the withdrawn funds for some noncommunity purpose, she might have a breach of fiduciary duty claim.  She would bear the burden of proof on such a claim, however.  But neither DeeDee nor her forensic accountant attempted at trial to show that any of these withdrawals was used for other than community purposes.  Nor have we been pointed to anything in the record indicating that Joe's accountant or Joe was ever asked about how the withdrawn cash was ultimately used.[9]  Joe's accountant did testify, however, that Joe generally kept cash invested in a brokerage account until needed, before moving it to one of the couple's checking accounts to pay community expenses.  DeeDee notes that postseparation Joe opened a separate checking account into which some of the withdrawals were deposited, but does not attempt to show the funds were not used for family expenses.

The trial court's statement of decision does not specifically address the issue of cash withdrawals.  DeeDee does not indicate

---

[9] Joe does not address the issue at all in his respondent's brief.

that she ever squarely raised the issue with the trial court, and she did not raise it in her request for a statement of decision or in her objections to the statement of decision.

For all the foregoing reasons, we affirm the trial court's findings that Joe's tracing was adequate to meet Joe's burden of proving his separate property, as set forth in the schedules appended to the judgment.

## II. Claims of Breach of Fiduciary Duty Based on Joe's Funding of the Children's 529 Accounts and Establishment of a Life Insurance Trust for the Benefit of the Children.

DeeDee asserts Joe breached his fiduciary duties under section 1100, subd. (b):  (1) by depositing a total of $160,000 of community funds into the children's pre-existing 529 accounts in March and August, 2010, and (2) by establishing a life insurance trust, with the children as the sole beneficiaries and his brother as the sole trustee, and in May 2010, using $245,000 of community funds to pay the premiums on a whole life insurance policy that would fund the trust in the event of his death, all without first obtaining her written consent to do so.

Section 1100, subd. (b) provides:

"A spouse may not make a gift of community personal property, or dispose of community personal property for less than fair and reasonable value, without the written consent of the other spouse.  *This subdivision does not apply to gifts mutually given by both spouses to third parties and to gifts given by one spouse to the other spouse.*"  (§1100, subd. (b), italics added.)

Violation of this subdivision is a breach of fiduciary duty. (*Fields v. Michael* (1949) 91 Cal.App.2d 443, 448 [applying

22

predecessor statute].)  Joe focuses on the last sentence of section 1100, subd. (b), arguing that the 529 account contributions and life insurance premium payment were "gifts mutually given by both spouses" to their children as part of an agreed upon estate plan.

The trial court rejected DeeDee's claims.  It confirmed both 529 account contributions as gifts, and held the life insurance policy was purchased as part of an estate plan.  Moreover, it found no breach of fiduciary duty.  The trial court retained jurisdiction over the 529 accounts and the life insurance policy.

We review a judgment on claims of a spouse's breach of fiduciary duty for substantial evidence (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1430), and conclude that substantial evidence supports the trial court's rulings.

Joe testified he discussed estate planning with DeeDee toward the end of 2009, including a will, creating 529 accounts for the children, and obtaining life insurance for the children's benefit, so the children would have money for themselves regardless of what might happen to Joe and DeeDee.  According to Joe's testimony, DeeDee was "fine with" the 529 accounts. With respect to the life insurance trust, Joe initially proposed to DeeDee that the policy be on DeeDee's life because—as a woman who was younger than he—it would be cheaper than insuring his own life.  She preferred that he obtain a policy on his own life, which is what he did.

DeeDee testified inconsistently about the 529 accounts and the life insurance policy.  Ultimately, she conceded she agreed with Joe's plan to set up 529 accounts for the children, was aware of (and participated in) some initial contributions, and thought

23

they were a good idea.  As she put it, "[i]t sounded great for the kids.  Anything for the kids."  She claimed, though, that she was unaware of the disputed 529 account contributions and creation of the life insurance trust until after the fact.

On appeal, DeeDee asserts there is no evidence in the record she and Joe agreed on the particulars of the challenged 529 account contributions (e.g., the timing and amount of the contributions) or the particulars of the insurance policy trust.  But, as she testified, throughout their marriage, Joe handled the finances and she trusted him to do so.  Joe confirmed that DeeDee was uninvolved in the family's finances.  It is undisputed there is no evidence she gave written consent to either the disputed college fund contributions or the purchase of the life insurance policy.

We infer that the trial court impliedly found the 529 account contributions and life insurance were "gifts mutually given by both spouses," and section 1100, subdivision (b) therefore is inapplicable.  Substantial evidence supports the conclusion that—in making the contributions and funding the life insurance trust—Joe was merely executing on a mutually agreed estate plan of gifting to the children.  The deposits into the 529 accounts are consistent with the parties' agreed plan to fund the children's college education through the 529 accounts. Given the upward trend in college tuition, additional contributions were necessary to meet that goal.  And the insurance trust is

24

consistent with the parties' mutual plan to make sure the children have funds available if their parents predecease them.[10]

### III.　Child and Spousal Support

DeeDee filed a request for order on December 5, 2013, seeking, among other things, to modify temporary child and spousal support.　For reasons the parties' briefing does not reveal, the trial court did not act on that request before trial.　It did, however, rule on that motion after trial.　Its judgment, entered March 18, 2016, retrospectively modified child support and temporary spousal support for three prior periods:　calendar year 2014; January 1, 2015–May 31, 2015; and June 1, 2015–December 31, 2015.　Also, the trial court set permanent child and spousal support for January 1, 2016 forward.　DeeDee seeks reversal of all of these determinations.　For the reasons set forth below, we reverse the trial court's pendente lite spousal and child support awards for 2014, and the permanent spousal

---

[10]　We are not precluded from inferring this implied finding.　With respect to the 529 accounts and life insurance trust issues, DeeDee only requested a statement of decision on whether she was "aware of and consented *in writing*" to use of the community funds for those purposes.　(Italics added.)　Because neither party contended DeeDee had given written consent, there was no reason to include that issue in the statement of decision. Her later objection that the statement of decision omitted any ruling on whether she had consented "in writing *or otherwise*" was insufficient to bar application of the doctrine of implied findings.　(See In re *Marriage of Arceneaux*, *supra*, 51 Cal.3d at p. 1134 [Code Civ. Proc., §§ 662 and 664 require *both* a request for a statement of decision on an issue and a pertinent objection to preclude inference of implied findings on that issue].)

support award.  We remand for further proceedings consistent with this opinion.

## A. Standard of Review and Law Applicable to Modification of Temporary Child and Spousal Support

Subject to exceptions not applicable here, a court may order temporary spousal support in "any amount" during the pendency of a dissolution proceeding, based on the moving party's need and the other party's ability to pay.  (§ 3600.)  The purpose of pendente lite spousal support is to maintain the parties' standards of living in as close as possible to the preseparation status quo, pending trial.  In fixing temporary spousal support, trial courts are not restricted by any set of statutory guidelines. The amount of the award lies within the trial court's sound discretion, and is reversible only on a showing of clear abuse of discretion.  (*In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327.)

"The trial court has broad discretion to decide whether to modify a temporary spousal support order.  [Citation.]  On appeal, we review the trial court's modification decision for abuse of discretion."  (*In re Marriage of Tydlaska* (2003) 114 Cal.App.4th 572, 575.)  We determine whether factual findings are supported by substantial evidence, and if so, affirm if any reasonable judge could have made such an order.  (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 730−731; *In re Marriage of Wittgrove, supra*, 120 Cal. App.4th at p. 1327.)

A court's discretion in setting pendente lite and permanent child support awards is constrained by the statutory scheme, as courts must adhere to the algebraic uniform state child support

26

guidelines in section 4050 et seq.  As stated in section 4052, "The court *shall* adhere to the statewide uniform guideline and may depart from the guideline only in the special circumstances set forth in this article."  (Italics added.)  To the limited extent permitted by statute, the court may exercise discretion to adjust awards where fairness so requires.  (*In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1043−1046; Hogoboom & King, *supra*, ¶ 6:151 at p. 6-105.)

### B. Use of 2013 Rather Than 2014 Tax Returns to Modify Temporary Child and Spousal Support for 2014 Requires Reversal and Remand

In modifying temporary child and spousal support awards for January 1 through December 31, 2014, the trial court exclusively used the parties' 2013 tax returns to determine their income, on the theory that "trailing year figures are the most appropriate figures to use" in calculating support.[11]  DeeDee agrees tax returns are "presumptively correct" for purposes of support calculations.  (See *In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 332.)  But she contends the court abused its discretion by using only 2013 tax returns, because 2014 tax returns were in evidence at the time the modifications were made, and the 2014 returns would have been more reliable indicators of actual 2014 income.[12]

---

[11]    Utilizing the Dissomaster guideline calculator, the court awarded DeeDee temporary child support of $1,077 per month and temporary spousal support of $655 per month.

[12]  2015 tax returns were not yet available at the time of trial.

27

Moreover, she argues she was disadvantaged by the use of her 2013 income to calculate the awards because in 2013 she had a nonrecurring capital gain of approximately $229,000 as a result of the parties' stipulated pretrial distribution of assets. The capital gain resulted in a much higher income figure for her in 2013 than 2014; consequently, use of her 2013 income lowered monthly child and spousal support payments to her. She raised this issue with the trial court in an objection to the court's tentative statement of decision. It responded that "[c]apital gains are income for purposes of support, nonrecurring or not," and noted her 2013 capital gains would have been available to her for purposes of support in 2014.

We conclude the trial court abused its discretion when it used the parties' 2013 taxable income as the sole measure of their respective incomes when modifying 2014 temporary child and spousal support, when 2014 tax returns were in evidence.

When a court initially fixes child and spousal support, it is required to use past income figures to project likely future income. Because no court has a crystal ball, it must rely on past income data to project future income, and income tax returns usually are the most reliable source. The relevant statutes appear to create a presumption that, under ordinary circumstances, the most recent annual income tax return would be an appropriate source for predicting future income. (See *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1083−1084 ["annual" income in §§4059−4060 as a benchmark for calculating "net monthly disposable income" makes sense in most cases and corresponds with income taxes which are calculated on an annual basis.]) Of course, in cases where a spouse's annual income fluctuates, a longer period might be more appropriate. (*Id.* at

p. 1084.) Modification of a temporary "spousal support order may be made only on a showing of a material change in circumstances," and where the modification involves payment of support into the future, a party seeking modification must provide current income and expense data from which the court can predict future needs and ability to pay. (*In re Marriage of Tydlaska*, *supra*, 114 Cal.App.4th at p. 575.)

Because the trial court was engaged in a retrospective modification of past support awards, governing 2014 only, no guesswork was required, however. Reliable 2014 income data was contained in the parties' 2014 tax returns.

We are guided by *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 824−827. In that case, at the time of trial in January 1999, the trial court erroneously calculated the husband's prospective income based on trial exhibits and expert testimony proving the husband's cash flow in 1996. The husband testified to a much lower income in 1998, and that testimony was corroborated by the husband's 1998 federal tax return. Nevertheless, the trial court based spousal support on the higher 1996 figure. The Court of Appeal reversed, and ordered the trial court, on remand, to use the husband's 1998 taxable income when recalculating spousal and child support awards for the period up to January 31, 1999 (approximately the time of the first trial). For the period January 31, 1999 to the date on which the trial court, on remand, determined the new amount of support, however, the trial court was ordered to consider evidence of the husband's "ability to pay *during that time period*." (*Id.* at p. 827, italics in original.) Presumably that would include 1999 and later tax returns, to the extent available.

29

Accordingly, we remand for the limited purpose of recalculating pendente lite 2014 child and spousal support. The court should consider 2014 income as established by 2014 tax returns or other authoritative evidence in the record of 2014 income. We recognize that, "[i]n practice, the precise definition of a party's 'gross' and 'net' income is subject to considerable court discretion (exercised within legal lines)." (Hogoboom & King, *supra*, at ¶ 6:196, p. 6-128.) On remand, the trial court may exercise its discretion, and "may properly consider the 'big picture' concerning the parties' assets and income available for support in light of the marriage standard of living. [Citation.]" (*In re Marriage of Wittgrove*, *supra*, 120 Cal.App.4th at p. 1327.) " 'Ability to pay encompasses far more than the income of the spouse from whom temporary support is sought; investments and other assets may be used for . . . temporary spousal support. [Citations.]' " (*Ibid*.) Similar information is relevant when assessing the supported spouse's needs. Thus, in modifying the temporary spousal and child support orders on remand, the trial court may include other relevant factors in addition to income shown on the parties' 2014 tax return, including DeeDee's 2013 capital gain and other assets available to the parties at the time, if deemed appropriate by the trial court. But it must also consider 2014 income, as revealed by the 2014 tax returns.

### C. Joe's "Rental Income"

DeeDee asserts the trial court erred by failing to include Joe's "rental income" in its child and spousal support orders, requiring reversal of all child and spousal support orders. She points to evidence indicating Joe had received, or anticipated receipt of, income from real estate investments in 2014 and 2015.

For the reasons discussed above, it was appropriate for the trial court to use the most recent annual tax return when fixing support. Thus, the court used Joe's 2014 income tax return (trial exhibit 158) to calculate support figures for January 1, 2015 to May 31, 2015; June 1, 2015 to December 31, 2015; and January 2016 forward. The trial judge included Joe's interest income, dividends, and payments Joe received from DoubleLine (for whom he served as a director), as revealed by the tax return. For the second period, the trial judge permissibly took into account that Joe had received an increase in compensation from DoubleLine (even though it was not reflected on the 2014 return).

The court's order does not mention rental income for Joe. But that is not surprising, because Joe's 2014 tax return does not separately call out any significant income from real estate investments. The summary included in trial exhibit 158 lists only $126 in income from rent, royalty, partnership, S Corp., or trust sources, but lists approximately $210,400 in interest income and $39,100 in dividends.

As noted above, tax returns are presumptively correct, and provided substantial evidence of Joe's income. Thus, the trial court was well within its discretion to rely on Joe's 2014 tax return (adjusting for the DoubleLine raise) in calculating Joe's income for the relevant periods. The court had discretion to

include additional income, to the extent proven, but we will not substitute our discretion for that of the trial judge.

### D. Joe's Investment Return on Divided Assets

DeeDee also asserts that, in calculating the child support award for January 2015 forward, the trial judge should have imputed an investment return on additional assets assigned to Joe as part of the division of assets included in the judgment. The short answer is, as discussed above, the trial court based its support award on presumptively correct tax returns from the prior year. It made an adjustment for the increased compensation from DoubleLine. It had discretion to consider other sources of income not included in the previous year's tax return, but was not required to do so. Also, income from most of the assets already was reflected in Joe's taxable income. Joe did receive half of the proceeds from the sale of the couple's home, and an equalizing payment that was paid from a portion of DeeDee's share of the house sale. But we have not been directed to evidence in the record concerning whether these sums were used to purchase another residence or to generate income. And DeeDee did not point to any evidence in the record from which the trial judge reasonably could predict and quantify anticipated additional income to Joe based on the property division.

### E. The Permanent Spousal Support Award

The trial court awarded DeeDee permanent spousal support of $5,000 per month, commencing January 1, 2016. DeeDee complains this amount is too low, when compared to the marital standard of living and Joe's ability to pay more, arguing "reversal is required." We agree.

32

"Permanent spousal support 'is governed by the statutory scheme set forth in sections 4300 through 4360. Section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320.' [Citations.] The statutory factors include the supporting spouse's ability to pay; the needs of each spouse based on the marital standard of living; the obligations and assets of each spouse, including separate property; and any other factors pertinent to a just and equitable award." (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442−1443, citing § 4320, subds. (c)-(e), (n); see *In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 207.)

" 'In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it. "The issue of spousal support, including its purpose, is one which is truly personal to the parties." [Citation.] In awarding spousal support, the court must consider the mandatory guidelines of section 4320.' " (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 269.)

" 'In balancing the applicable statutory factors, the trial court has discretion to determine the appropriate weight to accord to each. [Citation.] But the "court may not be arbitrary; it must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth in [the statute], especially reasonable needs and their financial abilities." [Citation.] Furthermore, the court does not have

discretion to ignore any relevant circumstance enumerated in the statute.  To the contrary, the trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support." (*In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1559.)

In this case, the court discussed its consideration and application of the section 4320 factors and circumstances, to the extent applicable, in its statement of decision:

"After the division of assets set forth herein, the Court finds that neither party will have any debt.  Additionally, both parties will have a significant asset base.  The Court finds, however, that [Joe] will have more assets than [DeeDee].  In [DeeDee's] October 2015 Income and Expense Declaration, she indicates monthly expenses of $36,700 including almost $5000 in obvious children expenses.  The Court has reviewed many of the other categories, and it is apparent that the children's costs are factored in those categories as well.  Additionally, [DeeDee] includes expenses to maintain her separate property condominium she co-owns with her sister, 'pocket money' and a housekeeper.  It appears to the Court that [DeeDee's] expenses are inflated.  As a result, the Court does not find her FL-150 [form] reliable.  The support award [of $5000/month] is sufficient to meet her needs in light of [DeeDee's] assets and income from those assets.

" Spousal [s]upport clearly was not the focus of this case. The Court finds that the parties spent little time presenting evidence on or arguing the mandated . . . section 4320 factors. Based upon the evidence actually presented, the Court finds that the parties had an upper-class life style [*sic*].  [Joe] made significant amounts every year; [DeeDee] did not work outside

34

the home. The parties easily paid off a multi-million dollar house and there did not appear to be any real spending curbs in place for either party. The parties enjoyed several country club memberships (one in Georgia), travel, luxury automobiles and extensive investments. There is no doubt [Joe] currently has the ability to pay a spousal support award. Both parties are in good health from an employment perspective. The Court finds that [DeeDee] has had some health challenges in the past, but there is no evidence that they currently prevent her from working. Regarding the other section 4320 factors, the Court finds that there is little evidence concerning them. The Court finds there are no special circumstances in this long term marriage; there are no unusual tax considerations. There is no documented history of domestic violence or the criminal conviction for domestic violence; to the extent that there was any domestic violence it did not impair in any way [DeeDee's] ability to work. [DeeDee] worked until the birth of her children and has not worked for several years. [DeeDee] clearly supported [Joe's] career and stayed at home raising the children. There is no evidence that care for these two older children impair in any way either party's ability to work; in fact, they currently enjoy a 50/50 custodial arrangement, thus, freeing [DeeDee] to seek and maintain employment. Neither children nor either party have any special needs that causes the Court to consider an increased spousal support award. The Court does not impute an income to [DeeDee] but does recognize she has significant investment income. Capital gains are income for purposes of support, nonrecurring or not. The Court further finds that the $884,305 that [Joe] received was a return on equity, not income. It is not a

taxable income amount.  The Court took no further factors into consideration in rendering the support award . . . ."[13]

For purposes of determining the permanent spousal support award, the trial court found (based on Joe's 2014 tax return) that Joe's taxable monthly income (from his work at DoubleLine and investment return on his assets) was $47,040. The court found DeeDee's taxable monthly income (consisting entirely of investment returns and rental income) was $20,790.

DeeDee criticizes the trial court's findings on a number of grounds.  First, she contends the trial court did not make a finding concerning what her section 4320, subdivision (d) needs actually are.  The "marital standard of living," which (as noted above) the trial court did describe, is "a general description of the station in life the parties had achieved by the date of separation," rather than a "mathematical standard."  (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 491 (*Smith*).)  "Section 4330 does not make 'marital standard of living' the absolute measure of reasonable need.  'Marital standard of living' is merely a threshold or reference point against which all of the statutory factors may be weighed.  [Citation.]  It is neither a floor nor a ceiling for a spousal support award."  (*In re Marriage of Nelson*, *supra*, 139 Cal.App.4th at p. 1560.)  After weighing the marital standard of living against the other statutory factors, "the court may 'fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case.' "

---

[13] The trial court also issued a *Gavron* warning to DeeDee. (*In re Marriage of Gavron* (1988) 203 Cal.App.3d 705.)

(*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1316.)

DeeDee's principal complaint about the $5,000 per month permanent spousal support award is that it is disproportionately low when compared to Joe's income and ability to pay, particularly considered in light of the "upper class" marital standard of living described by the trial court. "[W]e review spousal support orders under the deferential abuse of discretion standard. [Citation.] We examine the challenged order for legal and factual support. 'As long as the court exercised its discretion along legal lines its decision will be affirmed on appeal, if there is substantial evidence to support it.' [Citations.] 'To the extent that a trial court's exercise of discretion is based on the facts of the case, it will be upheld "as long as its determination is within the range justified by the evidence presented." ' " (*In re Marriage of Blazer, supra*, 176 Cal.App.4th at p. 1443; *In re Marriage of Ackerman, supra,* 146 Cal.App.4th at p. 197.)

Here, the trial court did not explain why it was just and reasonable to fix DeeDee's support award at $5,000 per month when (1) Joe's expected monthly income was $47,040, and (2) $5,000 per month in support, even when combined with DeeDee's monthly income of $20,790 would not support a standard of living equivalent to the marital standard of living described by the court. Having apparently disregarded DeeDee's FL-150 expense calculator, we are left to guess what evidence, if any, supported the trial court's determination that the support award is sufficient to meet DeeDee's "needs." Nor did the trial court relate the amount of the award to the marital standard of living. We therefore reverse the permanent spousal support award and remand for recalculation and clearer findings.

37

## IV. The Trial Court Abused Its Discretion When It Declined to Award DeeDee Additional Attorneys' and Accountants' Fees

Finally, DeeDee contends the trial court erred when it denied her posttrial motion for an award of additional attorneys' and accounting fees. We agree.

In its written order denying her fee request, the trial court observed DeeDee had by that time incurred slightly over $1 million in fees. According to that order, DeeDee previously had received a fee contribution of $67,500 and sanctions in the amount of $18,150 from Joe, for a total of $85,000 in fees. Joe had incurred approximately $1.2 million in professional fees, with about half of that amount being spent on his accountant's tracing analysis.

Having presided over the dissolution trial, the trial judge was knowledgeable about the parties' respective assets and incomes. As stated by the trial court, "Under a need and ability to pay standard, clearly [Joe], who is substantially gainfully employed and has a greater asset base, is better positioned than [DeeDee]. It is also true that [DeeDee] has a significant asset base from which to draw fees, but she is not employed and has no current employment prospects as far as the court is aware."

DeeDee's "significant asset base from which to draw fees," however, is no bar to a need-based fee award. By mandatory consideration of the parties' relative circumstances, section 2032 authorizes a need-based fee award even if DeeDee could pay her own attorneys' fees. (See *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1167; *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 883–884.)

38

Need-based fee awards in dissolution proceedings are governed by sections 2030 and 2032, as well as section 4320 (as incorporated by § 2032, subd. (b)).  Under section 2030, subdivision (a)(1), "the court *shall* ensure that each party has access to legal representation . . . to preserve each party's rights by ordering, if necessary based on . . . income and needs assessments, one party . . . to pay to the other party . . . whatever amount is *reasonably necessary* for attorney's fees and for the cost of maintaining or defending the proceeding . . . ."  (Italics added.) In addition, "the court *shall* make findings on whether an award of attorney's fees and costs . . . is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for [the] legal representation of both parties." (§ 2030, subd. (a)(2), italics added.)  Moreover, "[i]f the findings demonstrate disparity in access and ability to pay, the court *shall* make an order awarding attorney's fees and costs." (*Ibid*., italics added.)  The word "shall" has been italicized to emphasize the mandatory nature of these provisions.  (See *In re Marriage of Morton* (2018) 27 Cal.App.5th1025, 1050 [230 Cal.Rptr.3d 407, 425−426](*Morton*).)

We interpret the trial court's order as impliedly finding there was a disparity in access to funds to retain counsel and Joe was able to pay for the legal representation of both parties.  This implied finding was supported by substantial evidence.  Thus, an award of "reasonably necessary" fees and costs to DeeDee was mandatory.  (§ 2030, subd. (a)(1), (2); *Morton*, *supra*, 27 Cal.App.5th at pp. 1052−1053 [238 Cal.Rptr.3d at pp. 428−429].)

Notwithstanding the parties' relative economic circumstances, an award under section 2030 et seq. is properly denied if a case has been overlitigated or if the fees otherwise

39

were not "reasonably necessary." (§ 2030, subd. (a)(1); *In re Marriage of Huntington* (1992) 10 Cal.App.4th 1513, 1524; *In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 870−871.) Indeed, it is an abuse of discretion to award fees "without making any inquiry into the reasonableness of those fees." (*In re Marriage of Keech*, *supra*, 75 Cal.App.4th at p. 870.)

The trial judge was in a position to assess whether or not the case was overlitigated and the fees reasonably incurred. Well before trial, a different judge who was then presiding over the case had noted the case was being overlitigated, and predicted if the overlitigation continued DeeDee's attorneys' fees through trial would be $350,000 and accountants' fees would be $100,000. Nevertheless, fees well exceeded that estimate. The trial court found, "[t]he amount of fees expended on this matter was unreasonable. Balancing all of the fees expended against each other and taking into consideration the financial positions of the parties, it appears to the court that an order requiring all parties to pay their own fees is appropriate."

The trial court noted with apparent approval that almost half of the $1.2 million in professional fees incurred by Joe was spent on his accountant's tracing. The tracing, the court concluded, "was lengthy, expensive, and needed to be done in order for the respondent to carry his burden. For example, had [Joe] not carried his burden of proof through the tracing, [he] would not have been able to recoup his clearly separate property as it was hopelessly commingled." In contrast, the trial court criticized the accounting fees incurred by DeeDee as not reasonably necessary, primarily because DeeDee's forensic accountants "basically reviewed and relied on [Joe's accountant's] work."

40

But the trial court appears to have overlooked one critically important factor.  Significant amounts of both parties' fees were incurred because Joe "hopelessly commingled" assets.  Had he followed the more prudent course of segregating his separate property, much of the litigation cost—and concomitant dissipation of marital assets—would have been avoided.  DeeDee cannot be faulted for requiring Joe to trace his separate property and for incurring professional fees to review and litigate the issue.  Nor can she be denied mandatory fees for doing so.  We are concerned, also, that the trial court painted with too broad a brush when it characterized all of DeeDee's fees as unreasonable.  A much more nuanced and granular inquiry is required when assessing reasonableness in this context.  For that reason, we reverse the postjudgment order denying DeeDee's request for additional attorneys' fees, and remand for reconsideration in light of this opinion.

## DISPOSITION

The judgment is reversed with respect to the modification of the 2014 pendente lite child and spousal support awards, and the permanent spousal support award, and remanded for the limited purpose of recalculating those awards consistent with this opinion.  In all other respects, we affirm the judgment.  We reverse and remand the postjudgment attorneys' fee order.  Petitioner Dorothy Ciprari is awarded her costs on appeal.

CERTIFIED FOR PUBLICATION


CURREY, J.*

We concur:


ROTHSCHILD, P. J.


BENDIX, J.

_____

**\*** Associate Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.