Filed 5/12/21  Estate of Lu CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Estate of CHI ZEN LU, Deceased. | |
| HAL LIU,<br><br>        Petitioner and Appellant,<br><br>v.<br><br>CECILLIA DERPHINE WANG,<br>Individually and as Executor, etc.,<br><br>        Objector and Appellant. | A160649<br><br>(Alameda County<br>Super. Ct. No. RP-18-916424) |
| CECILLIA WANG, as Trustee, etc.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>HAL LIU,<br><br>        Defendant and Appellant. | A161583<br><br>(Alameda County<br>Super. Ct. No. RP-18-930905) |

These consolidated appeals arise out of conflicting claims to interests in two residential properties in Fremont (the properties), one located on Madrid Place (Madrid) and the other on Hidalgo Court (Hidalgo).  Hal Liu, surviving spouse of Chi Zen Lu, claims a community property interest in the properties.  Cecillia Wang, the decedent's daughter, contends the properties are owned by the Chi Zen Lu Trust.  Following a court trial, the probate court found that

1

Chi Zen's trust is the sole owner of the properties.[1]  The court also found that Hal must vacate Hidalgo, where he has been living since Chi Zen died.  But the court rejected Cecillia's claim that Hal owes the trust damages for the rental value of that property.  Both parties appeal.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  The Properties

Hal and Chi Zen married in 1989.  At that time, Chi Zen was the sole owner of Madrid and held title to Hidalgo in joint tenancy with two of her sisters, Chi Hwa Lu and Chi Chi Lu.

In March 1993, Chi Hwa, Chi Chi, and Chi Chi's husband executed a grant deed pursuant to which they granted Hidalgo to Chi Zen, who was identified in the instrument as an unmarried woman.  In November 1993, Hal executed a grant deed, which granted Hidalgo to Chi Zen "as her sole and separate property."

In October 1998, Hal executed a quitclaim deed that divested him of any interest in Madrid and quitclaimed the property to Chi Zen "as her sole and separate property."

In October 1999, Chi Zen executed a revocable trust and a pour-over will.  The trust was funded with the properties and an undeveloped lot in Truckee.  Chi Zen designated herself trustee, Cecillia substitute trustee, and Cecillia as her sole beneficiary.  The trust instrument and will both contain provisions expressly stating Chi Zen's intention to exclude Hal as a beneficiary because she had provided for him by leaving him other assets outside her estate.

---

[1] For clarity, we will use given names to refer to the parties, the decedent, and several witnesses.

2

During the second decade of his marriage to Chi Zen, Hal executed two "Interspousal Grant Deed[s]," which contain statements disavowing Hal's interest in the properties. A January 2007 deed conveyed all right, title, and interest Hal had in Madrid to Chi Zen "as her sole and separate property." And a December 2009 deed conveyed all right, title, and interest he had in Hidalgo to Chi Zen as her "sole and separate property."

In 2012 and 2013, Chi Zen and Hal executed a series of four deeds, the nature and impact of which became a focal point of the current litigation.

A September 2012 grant deed executed by Chi Zen (the September 2012 Hidalgo deed) contains the following language: "FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **CHI ZEN LU, TRUSTEE OF THE CHI ZEN LU TRUST DATED OCTOBER 5, 1999** hereby GRANT(s) to **CHI ZEN LU, TRUSTEE OF THE CHI ZEN LU TRUST DATED OCTOBER 5, 1999 AND HER HUSBAND HAL LIU, AS TENANTS IN COMMON** the following described property in the City of **FREMONT**." After Chi Zen executed the September 2012 Hidalgo deed, she and Hal used Hidalgo as security to obtain a $406,000 loan.

In April 2013, Chi Zen executed a grant deed (the April 2013 Madrid deed), which contains the following language: "FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **CHI ZEN LU, TRUSTEE OF THE CHI ZEN LU REVOCABLE LIVING TRUST DATED OCTOBER 5, 1999** hereby GRANT(s) to **CHI ZEN LU, TRUSTEE OF THE CHI ZEN LU REVOCABLE LIVING TRUST DATED OCTOBER 5, 1999 AND HAL LIU, A MARRIED MAN** the following described property in the City of **FREMONT**." After Chi Zen executed the April 2013 Madrid deed, she and Hal used Madrid as security to obtain a $273,500 loan.

3

On May 27, 2013, Chi Zen and Hal executed a grant deed (the May 2013 Hidalgo deed), pursuant to which they granted Hidalgo to Chi Zen as trustee of her trust. And, on June 3, 2013, Chi Zen and Hal executed another grant deed (the June 2013 Madrid deed), pursuant to which they granted Madrid to Chi Zen as trustee of her trust. Both deeds contain language that the transaction was made for no consideration and that the grant did not constitute a change in ownership under the Revenue and Tax code, as it was a gift.

## II. Probate and Trust Proceedings

In May 2018, Chi Zen died after a long battle with cancer. Chi Zen's will was admitted to probate and Cecillia was appointed executor of her mother's probate estate.

On October 12, 2018, Hal filed a Spousal Property Petition, in which he claimed an undivided one-half interest in Hidalgo and Madrid. Hal admitted that Chi Zen owned the properties "before marriage," but alleged that the community acquired interests in them because "successive mortgages were paid with community funds" and his name was "frequently" on the property titles "during the course of the marriage." Hal also claimed community property interests in the undeveloped property in Truckee, personal property in the Hidalgo house, and "[u]nknown bank and investment accounts" that were opened during the marriage.

Cecillia filed objections to the spousal property petition and a cross-petition against Hal. Cecillia objected that Hal not only failed to allege facts to support his claims but ignored evidence defeating them. Cecillia relied on Chi Zen's estate planning documents, title documents describing the properties as Chi Zen's separate property, and alleged admissions by Hal that he did not have any interest in the assets held in Chi Zen's trust. Cecillia's

4

cross-petition set forth causes of action for breach of fiduciary duty, fraud, and elder abuse, which were based on allegations that Hal made repeated assurances to Chi Zen that Cecillia would be the sole beneficiary of Chi Zen's trust, and that Chi Zen relied on these assurances by naming Hal the beneficiary of other assets she held outside her trust, including her pension and retirement accounts. The cross-petition also included a claim for conversion based on allegations that Hal took Chi Zen's personal property from Hidalgo, which he refused to return.

As trustee and beneficiary of Chi Zen's trust, Cecillia also filed a Petition for an Order Confirming Trust Assets. This petition was filed against Hal and Doe respondents who claimed an interest in the trust's three real property assets. In her first cause of action, Cecillia sought a determination that the trust holds titles against all adverse claims. A second cause of action against Hal for conversion alleged that Hal reneged on a promise to move out of Hidalgo, took Chi Zen's personal property from the house, and caused "waste" by allowing Hidalgo to "fall into disrepair and squalid conditions." Cecillia also alleged a cause of action for declaratory relief, seeking a judicial determination of the parties' respective rights to the properties.

A trial date for Hal's petition, the cross-petition and Cecillia's trust petition was set for December 2019. Cecillia had requested that these matters be consolidated with a civil action Hal filed against Cecillia for damages and constructive trust. The court treated the probate and trust proceedings as related but did not consolidate any cases.

## III.  Hal's Summary Judgment Motion

Prior to trial, Hal filed a motion for summary judgment or summary adjudication. Hal's sole claim in that proceeding was that Chi Zen

5

transmuted the properties to community property in 2012 and 2013.  (Fam. Code, § 852; statutory references are to the Family Code unless otherwise indicated.)  Specifically, Hal's theory was that the September 2012 Hidalgo deed and the April 2013 Madrid deed transmuted the properties into community property assets while the May 2013 Hidalgo deed and June 2013 Madrid deed did not transmute the properties back to Chi Zen's separate property.  Opposing Hal's motion, Cecillia argued that the "reverse" was true.

The trial court denied Hal's motion on November 26, 2019.  In its detailed written order, the court set forth the following facts, undisputed for purposes of the motion:  Chi Zen acquired Hidalgo and Madrid before she married Hal; prior to execution of the September 2012 Hidalgo deed, Hidalgo was Chi Zen's separate property; and prior to execution of the April 2013 Madrid deed, Madrid was Chi Zen's separate property.  Then, the court found that the four deeds executed in 2012 and 2013 do not satisfy the statutory requirements for transmutation, reasoning as follows:  To accomplish a valid transmutation of property by executing a deed, the deed must contain an express declaration that the characterization or ownership of the property is being changed.  (§ 852, subd. (a); e.g. *Estate of MacDonald* (1990) 51 Cal.3d 262 (*MacDonald*).)  None of the deeds executed in 2012 and 2013 "included sufficient language" to satisfy section 852's express declaration requirement.

After concluding that Hal was not entitled to summary judgment or summary adjudication, the court ordered that the "trial dates of December 9–13, 2019 are maintained to afford [Hal] the opportunity to establish a contribution claim and for hearing on [Cecillia's] Cross Petition and Trust Petition."

## IV. The Court Trial

Trial was held over four court days in early December 2019. As a preliminary matter, the court addressed the effect of its summary judgment order. In his trial brief, Hal continued to argue that the properties were transmuted to community property, but the trial court ruled that this matter was not going to be re-litigated. Because the deeds executed in 2012 and 2013 were not transmutations, the court found, the summary judgment evidence establishes that Hidalgo and Madrid were Chi Zen's separate property at the time of her death. The court urged the parties to focus on whether the community acquired interests in the properties through contribution.

Opening statements foreshadowed a factual dispute as to which marital partner took advantage of the other. Hal's trial counsel claimed that Chi Zen "took advantage" of Hal's "mental condition and difficulty with finances to cheat him out of his community property interest." Cecillia's counsel claimed that Chi Zen supported Hal financially throughout the marriage and made provisions for him in her estate plan, and that Hal always knew Chi Zen intended to leave the properties to Cecillia, but after Chi Zen died, he "turned on her," refusing to vacate the house and accusing her of undue influence with no evidentiary basis.

### A. Hal's Evidence

Hal called two witnesses: Julia Ross, and himself. Ross, an attorney, testified that she drafted Chi Zen's estate planning documents, did not perform any other legal service for Chi Zen, and never represented Hal. Ross could not remember drafting deeds pertaining to the properties in 2013, but she did not deny doing so. She recalled exchanging pleasantries with Hal,

7

but she did not remember having a conversation with him about Chi Zen's estate plan.

Hal testified that he was born in China, moved to the United States in the 1950's and obtained a PhD in Mathematics in the 1970's. He has not been employed since 1985 because he suffers from depression. Hal also has a bipolar illness and severe hearing loss. When Hal and Chi Zen married in 1989, Chi Zen knew Hal was unemployed and she never asked him to go back to work.

When Hal married Chi Zen, he owned stock worth approximately $100,000 and received income from disability and a pension. Under direct examination, Hal testified that while he was married to Chi Zen, he used his monthly income to pay utility bills at the Hidalgo house. Under cross-examination, Hal testified that his monthly benefits were deposited into his personal bank account at Wells Fargo, which he controlled. Hal could not recall his account balance at the time of Chi Zen's death, but he acknowledged treating the funds as his separate property.

While Hal was married to Chi Zen, he received an inheritance when each of his parents died. Hal testified that some of his inheritance was spent "very quickly in the household," but he did not elaborate further, stating "I don't know what happened." Part of the inheritance Hal received from his mother was deposited into an account at Wells Fargo that Chi Zen opened in Hal's name. Under direct examination, Hal testified that Chi Zen used another part of his inheritance to purchase stock on Hal's behalf from Ameritrade. Hal testified that Chi Zen took charge of his inheritance because she thought Hal was not capable of handling money. Under cross-examination, Hal acknowledged that during the marriage, he opened his own brokerage account at a company called Scottrade that later became TD

8

Ameritrade, he managed and controlled this account throughout the marriage, and he retained it as separate property after Chi Zen died.

Hal testified that Chi Zen had a checking account at Wells Fargo that she used to pay mortgages on Madrid and Hidalgo, and that rental income from Madrid was deposited into that account. During his direct testimony, Hal was asked where Chi Zen deposited her salary from her job. He responded, "I think her checking account." Hal's counsel asked if Chi Zen's salary during the marriage always went into the same Wells Fargo account, to which he responded: "As far as I know."

Hal was shown several deeds pertaining to the properties. He identified his signature on some of these deeds, but was not able to answer basic questions about any of them, such as why they were executed. Hal testified that he signed loan applications, but he and Chi Zen never discussed the loans or why they were made. Hal's name was put on loan applications along with his wife's name because the banker said that Hal's credit rating was better than Chi Zen's credit rating. Hal did not have "any idea" why Chi Zen took out loans on Hidalgo and Madrid, testifying that he believed Chi Zen's salary and his own income was sufficient to support them throughout their marriage.

Hal testified that the first time he heard the term "community property" was approximately a month after Chi Zen's death. During his 30-year marriage to Chi Zen, "not a single person, not once, explained anything related to property to [him]." Hal told people that he was "okay" with Chi Zen's plan to leave her real property to Cecillia because he trusted his wife and thought the property did not belong to him. If he had understood that he could have a community property interest in the properties he would not have been "okay" with his wife's plan to leave them to Cecillia.

9

After Chi Zen died, Cecillia pressured Hal to move out of Hidalgo, saying that he did not have a right to stay there because he did not pay the mortgage. Cecillia also took things from the house without Hal's permission and told him he could not invite people over. And she called him a thief and a liar for taking books that he had purchased. Hal testified that "[a]lmost all" of the personal property in the Hidalgo house was purchased during his marriage to Chi Zen. But he also admitted there were items in the house from before the marriage, including a dining table, Cecillia's desk, "[m]aybe a dresser," and "[m]aybe some chairs."

## B. Cecillia's Evidence

Cecillia called three witnesses at trial, two of Chi Zen's sisters and herself. Chi Zen's sisters, Chi Chi and Chi Hwa, testified that Hal was not a provider or a good husband. Both sisters recalled executing a grant deed that conveyed Hidalgo to Chi Zen in 1993. Chi Chi recounted two conversations when Chi Zen said she was going to leave real estate to Cecillia and her pension to Hal, and Hal said that he approved of that plan.

Cecillia testified about her close relationship with Chi Zen and her excellent relationship with Hal prior to Chi Zen's death. Cecillia, who was a teenager when her mother married Hal, disagreed with Hal's claim that all the property in the Hidalgo house was purchased during the marriage. She listed specific furniture, items of clothing and other personal belongings that Chi Zen owned before marriage, and also testified that her property was in her former bedroom.

Cecillia testified that while Chi Zen was married to Hal, Chi Zen discussed her estate plan in front of Hal, Cecillia and other family members. During these conversations, Chi Zen said specifically that she was going to leave her real estate to Cecillia and she was going to leave other assets to

10

Hal, including her pension.  This subject "came up over the years on a number of occasions" because Chi Zen had been defensive about marrying Hal.  Cecillia explained that, prior to the marriage, Hal and Chi Zen were in the same social circle, and many of their friends thought that Hal was a "gold digger."  Chi Zen defended Hal by assuring others that, even though Hal was unemployed, he was not interested in Chi Zen's real estate.  She would often say that Hal had offered to sign quitclaim deeds, and that he was not interested in her real property.

In late April 2018, Chi Zen asked Cecillia to help her schedule a meeting with Julia Ross so they could review Chi Zen's estate plan.  Cecillia arranged the meeting for the following month.  She did not tell Hal about the meeting, but he came with Chi Zen.  At the beginning of the meeting, Ross asked Chi Zen what she wished to discuss.  Chi Zen said she wanted to review her estate plan.  So Ross went through the will and trust instrument and summarized the key provisions, including the provisions stating that Chi Zen was going to "provide[] for Hal separately."  Because Hal and Chi Zen were both hard of hearing, Cecillia repeated many of the things that Ross said, using a loud, clear voice.

Shortly after Chi Zen died, Cecillia collected Chi Zen's financial and business records from the Hidalgo house because she wanted to make sure bills were paid.  The following month, Cecillia began paying the mortgages for the properties.  Cecillia determined from her mother's records that there was one outstanding mortgage for each of the properties.  The monthly payment for Hidalgo was $1,823.13 and the monthly payment for Madrid was $1,266.62.  Chi Zen's rental income from Madrid was $4,125 a month, which covered the total mortgage payments for the properties "and then some."

11

Cecillia obtained copies of bank statements from Chi Zen's Wells Fargo checking account dating back to 2009. The statements were not admitted into evidence because the trial court sustained Hal's objection that they were hearsay. However, Cecillia reviewed the statements while she was on the witness stand and testified that they reflected deposits equivalent to the rental income that Chi Zen received from Madrid.

Cecillia testified that after her mother died, Hal said he was going to live with his son in Portland. Cecillia attempted to assist Hal by packing up the house and helping him claim benefits that Chi Zen left to him. In late August 2018, Cecillia asked Hal when he was moving because it did not appear that he was making arrangements to leave. Hal responded by asking "[w]here is my eviction notice?" Hal told Cecillia that he had a lawyer and she should go look up California law. At that point, Cecillia questioned whether Hal had deceived Chi Zen throughout their marriage and was actually a thief.

After the evidence phase of trial, the parties were granted time to submit written closing arguments and proposed orders. The matters were deemed submitted on January 13, 2020.

## V. Order after Trial and Judgment

In an order after trial that was filed on March 3, 2020 (the March 2020 order), the court denied Hal's spousal property petition, finding that Hal is not entitled to any personal or real property held in Chi Zen's trust or probate estate. The court also granted in part Cecillia's cross-petition, finding that Chi Zen's trust "owns and has all rights, title, and interest" in Madrid, Hidalgo, and the undeveloped property in Truckee. The court found that the trust is entitled to "possession" of Hidalgo and to have Hal vacate that property "forthwith."

The March 2020 order contains findings on five material issues raised by the parties. First, Hal claimed that the two-thirds interest in Hidalgo that Chi Zen's sisters granted to Chi Zen in 1993 was a community property asset because it was acquired during the marriage. The trial court rejected this claim because Hal had acknowledged repeatedly throughout the marriage that Hidalgo was Chi Zen's separate property. Explaining this ruling, the court first pointed out that Hal's summary judgment motion was denied because the 2012 and 2013 deeds did not transmute Chi Zen's separate property interests. Then the court cited several deeds that were executed prior to 2012 and found that those "earlier deeds clearly recorded [Chi Zen's] sole ownership of the Hidalgo property during the life of their marriage."

Second, Hal claimed a community property interest in Hidalgo and Madrid based on contributions he made toward mortgage payments. Rejecting this claim, the court found that "any calculation of the percentage of community property ownership by [Hal] based on his alleged contribution would be completely speculative." In explaining this finding, the court addressed specific evidence that Hal had relied on to try to prove this claim. Although the court "agree[d]" Hal had testified that his social security benefits were deposited into an account he shared with Chi Zen and this joint account was used to make mortgage payments, the court found this testimony not credible because Hal was not able to recall any details about alleged deposits or payments. The court also rejected Hal's posttrial argument that Cecillia admitted during her testimony that the account used to pay the mortgages contained community funds. Further, evidence that Hal's income was used on a loan application was not evidence that the income was used to pay a mortgage. Finally, the court refused to consider Hal's "post-trial exhibits" that allegedly calculated the community interest in the

13

properties acquired through contribution. These exhibits had not been admitted at trial and Hal failed to demonstrate that they were based on admitted evidence.

Third, Hal claimed that Chi Zen exercised undue influence over Hal when he executed deeds that described Hidalgo and Madrid as Chi Zen's separate property. The court rejected this claim, finding no evidence Chi Zen took unfair advantage of Hal.

Fourth, Hal claimed that personal property in the Hidalgo house was community property because it was acquired during marriage. This claim was denied for lack of evidence.

Fifth, Cecillia claimed that Hal owed fair market rent for occupying Hidalgo since Chi Zen's death. The court rejected this claim because Cecillia failed to cite "persuasive evidence" of the fair market rental value of the property in her posttrial brief.

The March 2020 order was incorporated into a judgment that was entered on July 24, 2020. The judgment reiterates the court's key rulings: Hal is not entitled to any real or personal property held in Chi Zen's trust or probate estate; Chi Zen's trust is the sole owner of Madrid, Hidalgo, and the Truckee property; and "[t]he Trust is entitled to possession of Hidalgo and to have [Hal] vacate that property."

## DISCUSSION

### I. The Properties Were Not Transmuted

Hal challenges the finding that the September 2012 Hidalgo deed and the April 2013 Madrid deed did not transmute the properties to community property. As noted, the court made this finding in its summary judgment order and precluded the parties from re-litigating it at trial.

14

A transmutation changes "the character of community or separate property." (*In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1100 (*Benson*).) The requirements for transmutation are codified in section 852, which states in pertinent part: "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (§ 852, subd. (a); see *In re Marriage of Campbell* (1999) 74 Cal.App.4th 1058, 1062 [for a transmutation of property to occur, the requirements in section 852 must be met].)

The Legislature enacted section 852 in 1985 in order to abrogate prior law permitting transmutations by oral agreement or mutual understanding, with the intent to "increase certainty and honesty in marital property disputes, and to decrease the burden on the court in resolving such matters." (*Benson*, *supra*, 36 Cal.4th at p. 1100.) Courts have construed section 852 as "a 'presumption' that transactions between spouses are not 'transmutations,' rebuttable by evidence the transaction was documented with a writing containing the requisite language." (*In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 593.)

The requirements for a transmutation may not be proven with extrinsic evidence, nor may they be satisfied by "just 'any writing.' " (*In re Brace* (2020) 9 Cal.5th 903, 935 (*Brace*).) To constitute a transmutation, an instrument must contain a declaration by the adversely affected party " 'which expressly states that the characterization or ownership of the property is being changed.' " (*Ibid.*, quoting *MacDonald*, *supra*, 51 Cal.3d at p. 269; see *Benson*, *supra*, 36 Cal.4th at p. 1100 & 1106.)

15

Applying these principles, we affirm the trial court's findings that the September 2012 Hidalgo deed and the April 2013 Madrid deed did not transmute Chi Zen's separate property.

The September 2012 Hidalgo deed does not state that a separate property asset is being changed to a community property asset. Nor does it specify on its face what interest Chi Zen is transferring to Hal. The instrument contains a reference to a tenancy in common but, as the trial court observed, "[w]ithout resort to extrinsic evidence, the language of the Deed . . . does not state whether [Chi Zen] intended to give [Hal] a 1% interest or a 99% interest in the subject of the real property."

The April 2013 Madrid deed is even less specific than the Hidalgo deed. Again, this deed does not state on its face that Chi Zen's separate property is being changed to community property. Nor does it contain any information regarding the nature of the interest being granted to Hal, or any expression of Chi Zen's intent to transmute her property into a marital asset. Because this deed lacks *any* reference to the form in which the transferred property is to be jointly held, the law presumes a tenancy in common but, as with Hidalgo, this leaves unresolved the respective interests of the two owners. (See Civ. Code, § 686.)

Disputing our conclusions, Hal relies primarily on *Estate of Bibb* (2001) 87 Cal.App.4th 461 (*Bibb*). In that case, a husband executed a grant deed that conveyed his separate real property to himself and " 'his wife as joint tenants.' " (*Id.* at pp. 464–465.) The *Bibb* court found that the deed transmuted the husband's separate property into a joint tenancy, which became the wife's separate property upon the husband's death. (*Id.* at p. 469.) The court reasoned that "since 'grant' is the historically operative word for transferring interests in real property, there is no doubt that [the

16

husband's] use of the word 'grant' to convey the real property into joint tenancy satisfied the express declaration requirement." (*Id*. at pp. 468–469.)

Hal contends that *Bibb* shows that Chi Zen satisfied section 852's express declaration requirement because she used the word "grant" to convey the properties to herself and Hal. We disagree. The deed under review in *Bibb* used the word "grant" to transfer a husband's separate property to the husband and his "wife as joint tenants." A joint tenancy is a very specific type of estate that is owned jointly in undivided equal shares by two or more persons. (Civ. Code, § 683, subd. (a).) Because the husband in *Bibb* used the word "grant" in conjunction with the words "joint tenancy," the deed that he executed stated on its face that the form of property ownership was being changed from separate property to joint ownership by a husband and wife. (*Bibb*, *supra*, 87 Cal.App.4th at p. 468.) The deeds Chi Zen signed in 2012 and 2013 are materially different, as neither specifies the interest that is being transferred to Hal. Because Chi Zen did not express her intent to create a joint tenancy or otherwise change the character of her separate property, her use of the word "grant" was ambiguous and inadequate to establish that a transmutation occurred. (See *In re Marriage of Begian & Sarajian* (2018) 31 Cal.App.5th 506, 515 (*Begian & Sarajian*).)

The case before us is similar to *Begian & Sarajian*, a dissolution proceeding between Ida and Richard, who made conflicting claims to a residence referred to as Avonoak. (*Begian & Sarajian*, *supra*, 31 Cal.App.5th 506.) Prior to May 2006, they held a community property interest in Avonoak as joint tenants with Ida's mother Rose. (*Id*. at pp. 509–510.) Then, Richard, Ida, and Rose executed a " 'Trust Transfer Deed,' " which stated that they " 'hereby GRANT to IDA' " the property described as Avonoak. (*Id*. at p. 510.) The *Begian & Sarajian* court found that the May 2006 deed did not satisfy

17

the strict requirements for proving a transmutation of Richard's community property into Ida's separate property. (*Id.* at p. 515.)

The *Begian & Sarajian* court acknowledged *Bibb*'s holding that the word "grant" is an unambiguous expression of an intent to transfer an interest, but distinguished *Bibb* as a case in which "the court was forced to conclude" that the property was transmuted because the adversely affected spouse transferred it into a joint tenancy. (*Begian & Sarajian, supra*, 31 Cal.App.5th at p. 515.) By contrast, Richard's use of the word " 'grant' " in the May 2006 deed was ambiguous because that word "only establishe[d] his intention to transfer an interest in real property, 'without specifying what interest was being transferred.' " (*Ibid.*, italics omitted.) Moreover, the reference to a " 'Trust Transfer' " in the title of the May 2006 deed was a compounding ambiguity, as it supported Richard's contention that the purpose of the conveyance was not to change the marital character or ownership of Avonoak but only to put it into trust. (*Id.* at pp. 515–516.)

Hal contends that *Begian & Sarajian* is inapposite because the deeds Chi Zen executed in 2012 and 2013 were not titled as trust transfer deeds. This fact is hardly dispositive, particularly when the properties were being transferred out of and back into Chi Zen's trust. Regardless, these deeds are analogous to the deed in *Begian & Sarajian* because the word "grant" is not used in conjunction with any language, either in the title or the deed itself, that specifies what interest is being granted.

Hal also relies on *In re Marriage of Kushesh & Kushesh-Kaviani* (2018) 27 Cal.App.5th 449 (*Kushesh*), which holds that standard language in an interspousal transfer grant deed "meets the requirements for a transmutation of the character of marital property." (*Id.* at p. 451.) The *Kushesh* court reasoned that "constituent components of the word

18

'interspousal'—literally between spouses—plus the words 'transfer' and 'grant,' plus the usual statement about the grantee (or grantees) taking the property as either community or separate property, are all clear indicators the document constitutes an express declaration of an agreement to change the marital character of the property." (*Ibid.*, italics omitted.)

*Kushesh* does not assist Hal. The only deeds in this record that are analogous to an interspousal transfer grant deed are the deeds Hal executed in 2007 and 2009, which contain Hal's express declarations that Hidalgo and Madrid are Chi Zen's "sole and separate property." These earlier deeds support the trial court's finding that the properties were Chi Zen's separate property prior to 2012. However, none of the deeds executed in 2012 and 2013 were interspousal transfer grant deeds, as each lacks "the usual statement about the grantee (or grantees) taking the property as either community or separate property." (*Kushesh*, *supra*, 27 Cal.App.5th at p. 451.) Thus, *Kushesh* is consistent with the trial court's finding that Chi Zen did not transmute her separate property.

## II. The Two-Thirds Interest in Hidalgo

Hal challenges the trial court's finding that the two-thirds interest in Hidalgo that Chi Zen acquired in March 1993 is not community property. At the outset, we note that only in the most formal sense can one describe the interest Chi Zen acquired from her sisters in 1993 as a two-thirds interest. Testimony from the two sisters established that even when the property was held first in Chi Hwa's name alone, it was primarily Chi Zen who paid the mortgage. Later, the property was transferred into the names of all three sisters, although Chi Chi's name was added just so the sisters could qualify for a loan. When, in 1993, the three sisters transferred the property to Chi Zen alone, Chi Chi received no money for surrendering her interest, and Chi

19

Hwa received only $100,000, five percent of which she then rebated to Chi Zen. This payment to Chi Hwa represents only a small fraction of the property's value, which we know because Chi Zen promptly used the home as security for $383,150 in mortgage loans.

Hal's argument that the interest Chi Zen acquired from her sisters was community property relies on section 760, which states that "[e]xcept as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property." Section 760 establishes a " 'general presumption that property acquired during marriage by either spouse other than by gift or inheritance is community property unless traceable to a separate property source.' " (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 91 (*Ciprari*).)

This general community property presumption may be overcome by the party contesting community property status. (*Ciprari*, *supra*, 32 Cal.App.5th at p. 91.) Because it " 'is not a title presumption, virtually any credible evidence may be used to overcome it, including tracing the asset to a separate property source, showing an agreement or clear understanding between the parties regarding ownership status and presenting evidence the item was acquired as a gift.' " (*Ibid.*, fn. omitted; see *In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411, 1423; *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 289–290 (*Haines*), questioned on another point in *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1404.)

Whether the general community property presumption has been rebutted presents a question of fact for the trial court that is subject to review for substantial evidence. (*Ciprari*, *supra*, 32 Cal.App.5th at pp. 94–95.) Here, substantial evidence supports the trial court's finding that the general

community property presumption was rebutted.  After Chi Zen acquired her sisters' interests in Hidalgo, Hal acknowledged repeatedly that Hidalgo was Chi Zen's separate property.  In November 1993, for example, he executed a deed, which contains an express statement that Hidalgo is Chi Zen's "sole and separate property."  Later, after Chi Zen transferred Hidalgo into her trust, Hal executed the 2009 deed, which contains another express statement that Hal has no interest in Hidalgo and that Hidalgo is the "sole and separate property" of Chi Zen.

Hal contends that the trial court violated *Brace, supra*, 9 Cal.5th 903, by finding that the community property presumption was rebutted under the facts presented here.  Hal's theory is that the finding that Hidalgo is Chi Zen's separate property depends on application of a presumption that the holder of legal title also holds full beneficial title to property.  (Evid. Code, § 662.)  This finding cannot be sustained, Hal posits, because *Brace* holds that the community property presumption supersedes the legal title presumption.

Hal's premise that the trial court relied on a legal title presumption to characterize Hidalgo is not supported by the record.  The Hidalgo deeds are relevant here because they were executed by Hal after Chi Zen's sisters transferred their interests in Hidalgo to Chi Zen.  This documentation, combined with the facts that Hal repeatedly acknowledged to family and friends that Hidalgo was Chi Zen's separate property and that Chi Zen purchased the property before marrying Hal, constitutes substantial evidence rebutting the community property presumption.  This conclusion does not conflict with *Brace*, where, under very different facts, the Supreme Court held that "the community property presumption in Family Code section 760 applies not only to dissolution actions but also to a dispute between one or

21

both spouses and a bankruptcy trustee, and that [the title presumption in] Evidence Code section 662 does not apply when it conflicts with the Family Code section 760 presumption." (*Brace, supra*, 9 Cal.5th at p. 935.)

### III. The Finding of No Undue Influence

Hal contends the judgment must be reversed because the trial court denied him the benefit of a statutory presumption that Chi Zen exercised undue influence over him by depriving him of his community property interests in the properties.

"In property-related transactions between spouses, Family Code section 721, subdivision (b) 'imposes a duty of the highest good faith and fair dealing on each spouse . . . .' " (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1353.) "Thus, ' "[i]f one spouse secures an advantage from the transaction, a statutory presumption arises under section 721 that the advantaged spouse exercised undue influence and the transaction will be set aside." ' " (*Ibid.*)

Here, Hal argues that section 721's presumption of undue influence applies to the May 2013 Hidalgo deed, the June 2013 Madrid deed, and "all earlier deeds . . . which purported to grant [Hal's] community interests" in Hidalgo and Madrid to Chi Zen. We are not persuaded by this argument, which fails to afford Chi Zen's estate the same protection Hal demands for himself. There was evidence in this case that each spouse controlled a separate checking account, with Hal depositing his income during the marriage into an account he treated as his own separate property, notwithstanding the community property presumption. (See § 760.) Similarly with regard to Chi Zen's estate plan, Hal accepted an undivided interest in a life-time pension of $4,600 per month from Chi Zen's former employer plus financial assets worth some $220,000, without acknowledging that some portion of these were Chi Zen's separate or community property,

which she might have left to her daughter if she thought Hal would lay claim to any of the real estate.  In light of Cecillia's claims for breach of fiduciary duty, fraud and elder abuse, the trial court could well have found that the character of Hidalgo and Madrid cannot be decided based on competing presumptions of undue influence.

Even if Hal could invoke a presumption of undue influence against Cecillia under these circumstances, it would only apply as to a specific transaction in which one spouse gained an advantage over the other. (*Haines, supra,* 33 Cal.App.4th at p. 297.)  Some courts have emphasized that the advantage must be unfair for the presumption to apply.  (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 731; *In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 88.)  Here, Hal contends that he was disadvantaged by every deed that purported to transfer his community property interest to Chi Zen.  This theory rests on the premise that Hal had a community property interest in the properties whenever one of these deeds was executed.  The trial court rejected this premise by finding that the properties were always Chi Zen's separate property.  On appeal, Hal points to no evidence that would undermine this conclusion.  He asserts that Chi Zen bought her sisters out of Hidalgo with community property and used community property to pay the mortgages on both properties, but the record does not compel us to accept either of these allegations.  Indeed, some evidence points the opposite direction, establishing that Chi Zen borrowed much more against Hidalgo than she paid for Chi Hwa's interest in the property, and that she earned at least as much in rental income on Madrid as she paid for mortgages on the two properties together (discussed further below).

Hal makes a specific claim that a presumption of undue influence should have applied to the May 2013 Hidalgo deed and the June 2013 Madrid

deed. These were the deeds that transferred the properties back into Chi Zen's trust for the last time prior to her death. The trial court found, and we agree, that the properties were Chi Zen's separate property before these deeds were executed, and that the execution of these deeds did not transmute the properties. Since the properties were Chi Zen's separate property before and after these deeds were executed, Hal fails to show how the transactions disadvantaged him in any way. He therefore fails to trigger a presumption of undue influence.

Nor does Hal even attempt to point to direct evidence that Chi Zen unduly influenced him to agree to any of these transactions. The trial record contains substantial evidence that Hal and Chi Zen always intended for the properties to retain their character as Chi Zen's separate property, and that neither spouse took unfair advantage of, nor unduly influenced, the other.

## IV. Hal's Contribution Claim

Hal contends that even if the properties are Chi Zen's separate property, the trial court "separately erred in ruling that there was no community property interest created through the 5–6 years of mortgage payments after the [May] 2013 Hidalgo Deed and June 2013 Madrid Deed were executed."

"When community property is used to reduce the principal balance of a mortgage on one spouse's separate property, the community acquires a pro tanto interest in the property. [Citations.] This well-established principle is known as 'the *Moore/Marsden* rule.'" (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1421–1422.) The trial court did not make a *Moore/Marsden* calculation in this case because it concluded that community property was not used to reduce the mortgages on the properties. We review this factual finding under

24

the substantial evidence standard. (*In re Marriage of Ettefagh* (2007) 150 Cal.App.4th 1578, 1584.)

Hal testified that rental income from Madrid was deposited into the same account that Chi Zen used to make mortgage payments, and Cecillia corroborated this fact during her testimony. Cecillia also testified that the Madrid rental income was more than sufficient to cover the mortgage payments. This testimony was buttressed by Cecillia's extensive review of bank statements from Chi Zen's Wells Fargo account. During her direct testimony, Cecillia used those statements to testify about monthly deposits into the account that corresponded to the monthly rent owed by the Madrid tenants. Testimony on this subject covered several years and was not subject to any objection, although the bank statements were excluded pursuant to a hearsay objection. Cecillia's testimony about the amount of monthly rent paid by the Madrid tenants was corroborated by leases, which were admitted into evidence. And documentary evidence confirmed her testimony regarding the amount of the monthly mortgage obligations on Hidalgo and Madrid.

Evidence showing that rental income from Madrid was deposited into the same account that Chi Zen used to make mortgage payments and that this income was sufficient to cover the mortgages substantially supports the trial court's finding that Chi Zen used her separate property to pay mortgages on the properties. This is true because the trial court found that Madrid was Chi Zen's separate property, and rents received from a separate property source is also separate property. (§ 770, subd. (a)(3); *In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1010.)

On appeal, Hal argues that he proved the rental income from Madrid was not used to pay the mortgage obligations on the properties by producing income tax documents, which indicated that profits generated by Madrid

were too low to cover the mortgages. This argument ignores our substantial evidence review. The issue on appeal is not whether substantial evidence supports Hal's factual theory. "Rather, we review the entire record solely to determine whether substantial evidence supports the trial court's expressed and implied factual findings. If there is [substantial evidence], our analysis ends; we may not substitute our deductions for those of the trial court." (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 1006.)

In another attempt to avoid substantial evidence review, Hal contends the trial court ignored a presumption that the mortgages were paid by the community. Hal contends that this presumption was triggered by (1) Hal's testimony that his social security benefits were deposited into a joint account that Chi Zen used to pay the mortgages, and (2) Cecillia's "admissions" at trial that Chi Zen only had one checking account, which she used to pay all the mortgages on both properties.

First, Hal did not testify that he deposited his social security benefits into a joint account with Chi Zen or even that the couple had a joint account, but that he deposited his income into his own, separate account. Hal ignores this testimony in his appellate brief and instead relies on a statement in the March 2020 order that is not supported by the record.[2]

Second, Cecillia did not admit that Chi Zen paid the mortgages from a comingled account. During cross-examination, Hal's counsel asked this question: "At some point you were added onto the checking account that your

---

[2] After reviewing the confusing presentation of Hal's testimony at trial, we see how the court could have mis-remembered it, but the minor error did not affect the judgment because the trial court found Hal's testimony here not credible. Hal's reliance on the court's misstatement in his appellate briefs is, by contrast, difficult to comprehend and appears wholly unjustified.

26

mother received her salary from and paid her mortgage out of, correct?" Cecillia responded, "[y]es." We decline to construe this response as an admission that Chi Zen's salary was deposited into this checking account. Counsel's compound question was ambiguous because he misspoke in stating Chi Zen *received* her salary from the account. And although Hal testified, when his counsel asked whether Chi Zen's salary was deposited into her checking account, "[a]s far as I know," the trial judge rejected this testimony because he found Hal lacked basic knowledge about Chi Zen's checking account.

Even if Hal could establish that community funds were comingled with Chi Zen's separate property in her Wells Fargo account, that fact would not be sufficient to undermine the court's finding that Chi Zen used her separate funds to pay the mortgage. "Where funds are paid from a commingled account, the presumption is that the funds are community funds. [Citations.] In order to overcome this presumption, a party must trace the funds expended to a separate property source." (*In re Marriage of Frick*, *supra*, 181 Cal.App.3d at p. 1010; see *Brace, supra*, 9 Cal.5th at p. 914 ["a spouse may rebut the Family Code section 760 presumption by tracing the source of funds used to acquire the property to separate property"].) "This issue presents a question of fact for the trial court and its finding will be upheld if supported by substantial evidence." (*Frick*, at p. 1010.) At trial, Cecillia traced rent payments from Madrid into Chi Zen's Wells Fargo account and presented evidence that those payments were sufficient to cover the mortgages on both properties. Thus, the record supports the trial court's finding that the funds expended to pay the mortgages are traceable to a separate property source.

27

## V.  Hal's Claim Regarding Loan Proceeds

Hal contends the trial court failed to consider evidence that the community has an interest in the proceeds from the two loans that Hal and Chi Zen obtained in 2012.  Hal argues that the trial court erred by "dismissing" this "aspect" of his "claims at trial."

We reject Hal's contention that the trial court dismissed part of his case by failing to make an express finding as to whether these loan proceeds were community property.  Hal's petition does not include a claim to recover proceeds from loans made during the marriage.  Nor do we find any indication that Hal requested a written finding on this specific issue, or any other issue for that matter.  (See Code Civ. Proc., § 632 [court must issue statement of decision addressing "principal controverted issues at trial upon the request of any party"].)

Hal's broader contention that the trial court failed to consider evidence of an alleged community interest in the loan proceeds is not a cognizable claim of error.  Hal purports to show that a presumption the loan proceeds are community property was not overcome at trial, but he fails to explain how the presumption benefits him in any concrete way.  Hal cites no evidence that addresses how these loans were used or that even suggests the loan proceeds are an existing asset that is subject to classification.  " ' "We are not bound to develop appellants' arguments for them." ' " (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 360.)  Thus, we treat this matter as waived.  (*Ibid.*)[3]

---

[3]  Hal contends that although the trial court awarded the properties to the trust, he remains liable for both mortgages.  This contention, unsupported by citation to evidence or legal authority imposing such an obligation on him, is not adequate to state a cognizable claim of error on appeal.

## VI.  The Order Granting Possession of Hidalgo to Cecillia

Hal contends the order requiring him to vacate Hidalgo must be reversed because (1) the trial court lacked jurisdiction to make this order, and (2) Hal's constitutional right to due process was violated.  Both parts of this argument are erroneous.

Hal concedes that the trial court would have jurisdiction to order him to vacate Hidalgo if Cecillia had filed a claim under Probate Code section 850, et seq., but he argues that Cecillia failed to plead this "type[]" of action.  Hal overlooks that Cecillia's trust petition was filed "pursuant to [Probate Code] Section 850."  Furthermore, Hal's argument that the court lacked jurisdiction to make this order rests on the erroneous premise that this "issue" was not raised in the pleadings or pretrial proceedings.  (Citing *Orange County Water Dist. v. City of Colton* (1964) 226 Cal.App.2d 642, 649.)  Cecillia's cross-petition and trust petition both state claims for declaratory relief regarding the respective rights of Cecillia and Hal to the properties, and both petitions include requests for judicial declarations that:  (1) Cecillia owns "all" interests in each of the properties; (2) Hal does not have "any interest" in the properties; and (3) the "Marital Community" has "no" interest in the properties.  In addition, Cecillia's trust petition relies specifically on allegations that Cecillia made a request of Hal to move out of Hidalgo and that Hal promised to move out of the house by September 2018.  These allegations and claims for declaratory relief were sufficient to put at issue the specific question whether Hal has any right to occupy the Hidalgo house.

Hal's due process claim posits that Hal was denied his right to a "pre-ouster hearing."  Hal bases this claim on *Mendoza v. Small Claims Court* (1958) 49 Cal.2d 668, 672–673, which recognizes a constitutional right to a noticed hearing in unlawful detainer proceedings.  This analogy is

29

unavailing, as Hal was afforded a full trial of his claims and the claims against him.

## VII. Hal's Claims Regarding Evidence Rulings

Hal contends the trial court made multiple errors regarding the admission and exclusion of evidence, each of which requires reversal of the judgment and reconsideration of his claims. For clarity, we address these arguments as they pertain to a specific witness.

" 'Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion.' [Citation.] '[T]he trial court is vested with broad discretion in ruling on the admissibility of evidence, and its ruling will be upset only upon a clear showing that it exceeded the bounds of reason.' [Citation.] In addition, a 'trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a "miscarriage of justice"—that is, that a different result would have been probable if the error had not occurred.' " (*Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1040.)

### A. Julia Ross

Hal's attorney asked Ross if she and Chi Zen had discussed "community property." After Ross answered "[n]o," the trial court sustained an objection that this question called for attorney-client privileged information. The court then advised Hal's counsel to "[m]ove on."

Hal contends that Ross's testimony on this matter was not privileged because Evidence Code section 957 provides that the attorney-client privilege does not apply to "a communication relevant to an issue between parties all of whom claim through a deceased client." We conclude that section 957 is inapplicable because Hal is not claiming an interest in the properties "through" the deceased client of Ross. His claims are adverse to Chi Zen, as

30

they are made against her trust estate. (*DP Pham LLC v. Cheadle* (2016) 246 Cal.App.4th 653, 669–672.) Hal relies on *Paley v. Superior Court* (1955) 137 Cal.App.2d 450, which involved materially different facts and legal principles. Nothing in that case supports Hal's theory that his claims are made through Chi Zen, rather than against her.

Further, Hal fails to demonstrate prejudice. He contends the testimony he sought to elicit from Ross was highly relevant because evidence that Ross and Chi Zen discussed community property law would have supported his trial theory that Chi Zen purposefully concealed the legal effect of deeds that she convinced Hal to sign. This theory of relevancy reinforces our conclusion that Hal's claims are indeed adverse to Chi Zen. Beyond that, Hal fails to recognize that the allegedly erroneous ruling had no practical effect. Although the court sustained an objection, it did not strike Ross's answer to the question, that she did not discuss community property with Chi Zen. Ross went on to explain that she did not remember preparing any of the deeds pertaining to these properties or "recall anything about 2013 vis-a-vis this client."

**B. Hal**

Exhibit 58: Hal's counsel asked him several questions about a 2012 application for a loan secured by the Hidalgo property that was marked as Exhibit 58. Hal could not identify this document, nor did he recall how or why it was completed, but he identified his signature and Chi Zen's signature. When Hal's counsel moved to admit Exhibit 58, the court sustained Cecillia's hearsay objection.

Hal contends Exhibit 58 was admissible under Evidence Code section 1225, an exception to the hearsay rule that permits statements by a predecessor in interest to be admitted against a successor in interest of real

property. Hal argues this document is admissible against Cecillia because it would have been admissible against Chi Zen as an admission that she used Hal's income to qualify for the loan. Assuming this was a valid theory, we find no prejudice. Hal's trial counsel used the exhibit to refresh Hal's recollection that his social security income was listed as an income source on the application and that Chi Zen told him that his income was necessary to get this loan. Therefore, any error in failing to admit Exhibit 58 was harmless.

"Demonstrative" Exhibits: Hal contends that the trial court erred by excluding four exhibits that were "offered as Exhibits 50, 51, 68 and 69." Hal includes these documents in his appellant's appendix, although he assigns them different exhibit numbers. As a preliminary matter, we find no evidence in this record that Exhibits 68 and 69 were offered into evidence at trial, so Hal's argument about what these documents show is improper, and we will limit our discussion to Exhibits 50 and 51.

During Hal's direct testimony, he was asked to "take a look at" Exhibit 50, a document that was titled " 'Hidalgo loan details.' " Cecillia's counsel objected that this exhibit was "just Counsel's argument put on paper." Hal's counsel responded that Exhibit 50 was "demonstrative evidence" showing calculations that were "done to determine the community property payments" on the Hidalgo mortgage. Then he asked Hal whether the first two pages of Exhibit 50 contain "information from the deeds of trusts" on Hidalgo over the course of the marriage. The court sustained Cecillia's objection that this question lacked a proper foundation.

Hal's trial counsel disputed the ruling, arguing an adequate foundation had been laid for Exhibit 50 because Hal reviewed the Hidalgo deeds of trust and testified about them. Rejecting this argument, the court explained that,

32

although the deeds were admitted into evidence, Hal "doesn't know anything about them. . . . I can look at it and make my own determination but he still doesn't know what these things say. He recognizes the signature. Sometimes you've demonstrated that he can read. But he hasn't—he doesn't know anything about these documents."

The trial court told Hal's counsel that he might be able to use Exhibit 50 "for some argument," but Hal could not testify about it absent "anything to indicate that he actually recognized" the deeds, knew what they said or even remembered them. The court also suggested counsel could go back over the deeds of trust with Hal and ask questions to establish some knowledge. Instead, counsel turned to Exhibit 61, which was referred to as a summary. When the court asked whether Hal "put together this summary," his counsel responded that "[w]e put it together together." The court ruled that Hal could not be questioned about Exhibit 61 and instructed counsel to "[m]ove on."

Hal's counsel moved on to Exhibit 51, which he described as "information regarding the Madrid loan details." The court sustained Cecillia's objection to asking Hal questions about this exhibit, on the ground that Hal hadn't testified that he had "any knowledge" of the information in Exhibit 51 and he was "not the right witness to testify about this."

On appeal, Hal argues the trial court erred because Exhibits 50 and 51 are admissible "demonstrative" exhibits containing calculations that are relevant to establish the value of his community property interest in each of the properties as it has grown over time.

Demonstrative evidence refers to evidence that is shown to the trier of fact " ' "as a tool to aid . . . in understanding the substantive evidence." ' " (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1036.) As the trier of fact in

this case, the trial court did not abuse its discretion by concluding that Exhibits 50 and 51 did not aid the court in understanding the substantive evidence. At trial, Hal's counsel argued that the deeds of trust on Hidalgo and Madrid established a foundation for admitting Exhibits 50 and 51 into evidence. The trial court did not err by rejecting this argument. The deeds of trust did not supply a foundation for Hal's testimony because Hal testified he had no knowledge or recollection of the deeds of trust, and the exhibits appear to assume that all mortgage payments were made with community property, an assumption not supported by the evidence.

Taking a different tack, Hal argues that if the trial court had not prevented him from testifying about these exhibits, his testimony would have established a foundation for admitting the documents into evidence. The record shows otherwise. At trial, the court suggested that Hal's trial counsel go back over the deeds of trust with Hal to see if he knew anything about them. Hal's counsel elected not to take that opportunity to lay a foundation for these exhibits.

Tax Return Documents Prepared By Hal: Under direct examination, Hal was asked to review Exhibit 1, a 2016 Individual Income Tax Return Form 1040, that contained handwritten information. Cecillia objected that this document, and several other tax returns that Hal had marked as trial exhibits, had not been produced in discovery, were hearsay, and were protected from disclosure by the taxpayer privilege. After discussing the alleged discovery violation, the court inquired why Hal was offering these exhibits. Hal's counsel stated that the tax returns were relevant to rebut Cecillia's claim that rental income from Madrid was sufficient to pay the mortgages for both properties. The court ruled that, in order to be "fair for all

34

purposes concerned," the court would permit Hal to use the exhibits to refresh his recollection about income that was generated from Madrid.

Hal's counsel led Hal through Exhibit 1, extracting specific information about rental income figures that had been recorded on the document. After completing this exercise, Hal's counsel moved to admit the exhibit into evidence and the court sustained Cecillia's objections to it. Hal's counsel repeated the same exercise with Exhibit 2, a 2012 California tax return document, and Exhibit 3, a 2014 California tax return document. The court afforded counsel wide latitude to lead Hal through the exhibits but denied his request to admit them into evidence.

On appeal, Hal argues that (1) he had authority to waive the taxpayer privilege, and (2) these tax return exhibits were admissible hearsay because they were admissions by Chi Zen. Even if these arguments are true, Hal ignores the fact that the challenged ruling was an appropriate resolution of the alleged discovery violation. Nor does Hal establish prejudice. He argues these exhibits were relevant to show the rental income from Madrid, ignoring the fact that the court's compromise permitted him to elicit this very evidence.

Asking Hal to Confirm Prior Testimony: On the third day of Hal's testimony, his attorney asked the following question: "Mr. Lui, you've previously testified that during your marriage, no one explained to you that you might have a community property interest in Hidalgo or Madrid or other property; is that right? No one explained that to you during your marriage?" After Hal answered "[n]o," Cecillia's counsel objected that the question had been "[a]sked and answered." The court sustained this objection, but Hal proceeded to answer the question a second time, stating, "You're correct."

On appeal, Hal contends the trial court erred because "asked and answered" was an invalid objection. We disagree. Counsel explicitly acknowledged that he was asking a question that had previously been answered, and the record shows that Hal had already repeatedly testified that nobody explained community property law to him. Moreover, Hal's answer was not stricken from the record. Thus, we find neither error nor prejudice.

Cross-Examination: Hal contends the trial court erred by overruling two of his counsel's objections to questions that Hal was asked during cross-examination. First, Hal was asked whether proceeds from mortgage loans were used to pay off prior loans. After Hal responded that he did not know, his counsel objected that the question "[l]acks foundation." The court overruled this objection. On appeal, Hal posits that the objection was valid because there was no prior testimony about how the loan proceeds were used. Even if this is true, there is no prejudice; Hal's response established nothing more than the fact he had no foundation for answering the question—that he did not know the answer.

A short time later, Hal was asked whether he was aware that there was a mortgage on Hidalgo prior to 2012. After Hal responded "[y]es," opposing counsel asked: "And you weren't paying the mortgage, were you?" Hal's counsel objected that the question called for a legal conclusion. The objection was overruled and Hal answered "[n]o." On appeal, Hal argues this question was improper because it asked Hal for an expert opinion. We disagree; the question whether Hal made mortgage payments for the properties was factual, appropriate, and relevant.

## C. Chi Chi

When Hal's trial counsel cross-examined Chi Zen's sister Chi Chi, he asked her who owned Hidalgo at the time that Chi Zen and Hal got married. Chi Chi responded: "My sister." When counsel questioned this response, Chi Chi testified that her sister had worked "her butt off to get mortgage to own that house," and if she bought the house in 1981 then she owned it in 1989 when she married Hal. Then Hal's counsel showed Chi Chi a copy of a 1981 deed, which conveyed Hidalgo to Chi Hwa (rather than Chi Zen), and asked the following question: "So isn't it true that Chi Zen Lu didn't buy Hidalgo in 1981?" Cecillia's counsel objected that this question called for speculation. The objection was sustained and counsel rephrased, asking whether the document refreshed Chi Chi's recollection about who bought Hidalgo in 1981. Chi Chi responded that Chi Hwa was named in the deed but Chi Zen paid the mortgage.

On appeal, Hal argues the trial court erred because his trial counsel's initial question about the 1981 deed did not call for speculation, but simply asked Chi Chi to confirm a fact that was proven by the deed. This ruling was prejudicial, Hal argues, because it prevented him from establishing that Chi Chi lied about the original owner of Hidalgo. Hal's analysis is unsound. The fact that Chi Hwa's name was on the 1981 deed did not necessarily mean that Chi Chi lied in answering, "My sister." Aside from the fact that both women were her sisters, Chi Chi's testimony made clear why she considered Chi Zen the owner of the property, even though title was held in Chi Hwa's name. In any event, Hal's attorney established with his rephrased question (and by admitting the 1981 deed into evidence) that Chi Hwa was the sister named on the deed, so if there was error it caused no prejudice.

### D. Chi Hwa

Chi Hwa testified about an argument that Hal had with his son when several family members were attempting to clean out the Hidalgo house. According to Chi Hwa, Hal had been sleeping while the group hauled some of his things out of the garage and into a dumpster that had been left in the driveway. The noise woke Hal who became very angry. Hal's son said things like, "we got to get rid of this junk," "[y]ou got to get out of this house," and the "house does not belong to you." The trial court overruled an objection to these statements. On appeal, Hal claims they were inadmissible hearsay. The testimony was admissible for a non-hearsay purpose because, regardless of the truth of what Hal's son said, the fact that the argument happened supported Cecillia's claim that Hal agreed to move out of the house but then refused to do so. Chi Hwa was competent to testify about the altercation because she was present when it happened.

### E. Cecillia

Hal's Tax Return Documents:  Under cross-examination, Cecillia testified that she recognized Hal's handwriting on Exhibit 1, the 2016 tax return document that had been produced (but not admitted) during Hal's testimony. Cecillia acknowledged that she heard Hal testify that he had filed this document with the IRS, but she had no knowledge if this was true. Counsel asked if Cecillia had reason to question whether rental income reported on the exhibit was accurate and Cecillia testified that she did question whether the figure was accurate. Then Hal's counsel asked Cecillia to look at Exhibit 2, which counsel described as a 2012 tax document that had not been admitted into evidence. Cecillia had never seen the document before and did not know if the information was accurate. Then counsel asked about a 2005 income tax return that Cecillia had found in her mother's file.

Cecillia did not know if the document was a draft or a copy of something that had been filed with the IRS. Hal's counsel asked Cecillia if she could "explain why" she thought that the Madrid rental income was sufficient to pay the mortgages on the properties when the rental income "on all of these tax returns" was lower than the monthly mortgage payments. Cecillia did not answer this question because the trial court sustained objections that it assumed facts not in evidence about monthly mortgage payments and called for speculation about whether the tax returns were accurate.

On appeal, Hal argues his counsel's question did not assume facts not in evidence because Cecillia had already testified about monthly mortgage obligations on the properties, and Cecillia could provide her opinion about this evidence without having to speculate. Therefore, Hal posits, the court erred by denying him sufficient latitude to conduct cross-examination. (Citing *McDonald v. Price* (1947) 80 Cal.App.2d 150, 152.)

"[C]ounsel in putting questions to the witness should not be allowed to assume facts not in evidence and state as positive assertions facts which if true would be detrimental to the opposing party's case. . . . This is especially true where . . . there is no proof of the facts asserted." (*McDonald v. Price*, *supra*, 80 Cal.App.2d at p. 152.) The question Hal's counsel asked Cecillia violated these rules. Cecillia had testified about the mortgage obligations and about the rent earned from Madrid, but she also testified that she did not have any knowledge about Hal's tax return exhibits. To answer counsel's question, Cecillia would have to speculate about whether the tax returns were accurate, whether they were filed, and whether they falsely reported income. Sustaining the objections was not error.

Speculation about Hal: Under cross-examination, Cecillia was asked the following question: "Isn't it correct that Hal never expressed any intent

39

to forego his community property interest except in the quitclaim deeds that we have seen in Court this week?" The court sustained an objection that this question called for speculation. On appeal, Hal contends the objection should have been overruled because his counsel was entitled to wide-latitude. The question called for speculation because of the use of the word "never," in a question that was not limited to what Cecillia herself had seen or heard. The objection was properly sustained.

Cecillia's testimony about statements made by third parties: Hal contends that Cecillia's testimony about the May 2018 meeting she attended at Julia Ross's office was inadmissible hearsay. This testimony was admissible for the non-hearsay purpose of establishing that the meeting occurred and that certain matters were disclosed to Hal. In particular, the testimony established that Ross walked Chi Zen and Hal through the key provisions of Chi Zen's estate plan.

Hal also objects to the admission of testimony by Cecillia that a friend asked her why she went to collect documents from Hidalgo the day after Chi Zen died. This brief testimony was part of Cecillia's explanation for her own conduct. It was not offered to prove the truth of her friend's statement.

Hal's Sleeping Habits: Under direct examination, Cecillia was asked whether she gave Hal prior notice before entering the Hidalgo house. Cecillia responded that Hal had given her a key to the house, but she always tried to give him a "heads up" before coming over. She explained that Hal often slept during the day, and would get up some time in the afternoon. Cecillia testified that this was Hal's "habit" throughout the time he was married to Chi Zen.

Hal contends Cecillia's testimony was character testimony that was inadmissible to prove his "conduct on a specified occasion." (Evid. Code,

40

§ 1101, subd. (a).)  The evidence was offered to explain Cecillia's conduct, not Hal's conduct on a specific occasion.  Nor are we persuaded by Hal's rote contention that this testimony prejudiced him.

## VIII.  Cecillia's Claim Regarding the Denial of Damages

Cecillia's appeal challenges part of the judgment denying her damages for Hal's refusal to vacate Hidalgo after Chi Zen's death.  She argues that there is no evidence in this record to support the trial court's "implicit" finding that the trust is entitled to $0 for Hal's occupancy of Hidalgo since May 2018.

Cecillia mischaracterizes the trial court's finding.  The March 2020 order that was incorporated into the judgment makes clear that Cecillia's claim for back-rent from the date that Chi Zen died was denied for failure of proof.  Specifically, the court found that (1) Cecillia's posttrial brief did not cite persuasive evidence to establish a "fair market rental value" for Hidalgo, but nevertheless (2) the court would order Hal to "vacate" the property.

On appeal, Cecillia argues that her damages claim against Hal was proven by evidence establishing that Hidalgo and Madrid are similar properties and the current occupants of the Madrid house pay $4,125 per month in rent.  Because Cecillia elected to omit her posttrial brief from her appendix, we cannot determine whether this argument was presented to the trial court.  Assuming this damages theory was asserted below, it does not compel us to reverse part of the judgment.

Cecillia's damages claim rests on an assumption that Hal's possession of Hidalgo became unlawful on the day Chi Zen died.  She cites no evidence supporting this view and ignores testimony suggesting otherwise.  Cecillia testified that Chi Zen, Hal, and Hal's son made a plan that after Chi Zen died, Hal would move to Oregon to live with his son.  Cecillia did not testify

41

that anybody agreed Hal would vacate the house immediately. Further, Cecillia admitted that after her mother died, she agreed to let Hal stay in the house at least until September, which was when she wanted to find renters for the property. In late August, she asked Hal when he was moving because she "saw no sign" that he had "packed anything other than his record albums." At that point, Hal became angry, disclosed that he had a lawyer, and demanded an eviction notice. Cecillia testified that she was angered by this altercation, but she did not testify that she demanded that Hal vacate the house.

Cecillia's damages claim also rests on an assumption that, from the date Chi Zen died, Hidalgo could have generated the same rental income that the trust receives from the current occupants of Madrid. This assumption was supported by some evidence; Cecillia produced appraisals of Hidalgo and Madrid, which show that the properties are located in the same area and have comparable fair market values. However, Cecillia ignores that a property's sale value could be very different from its rental value. In her trust petition, Cecillia stated that the Hidalgo house had fallen into disrepair before Chi Zen died. This allegation was confirmed by Chi Hwa, who testified that while Chi Zen was alive Hal "trashed" the Hidalgo house and did not "upkeep the house" once he found out that he did not have an interest in it. Also, Cecillia testified that while Chi Zen and Hal were married, Hal had a "hoarding problem," which adversely affected the condition of the Hidalgo house. In light of this testimony, the trial court was not compelled to accept Cecillia's claim that the trust could have received the same rent for Hidalgo as was paid for Madrid.

In her Cross-Appellant's reply brief, Cecillia argues that the finding by the trial court that the trust is entitled to possession of Hidalgo necessarily

means the trust is also entitled to damages for "unauthorized occupation" of the property.  This argument is not supported by legal authority and appears to ignore the fact that the trust's right to possession of Hidalgo was established when judgment was entered in this case.

## DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.

TUCHER, J.

WE CONCUR:

POLLAK, P. J.
BROWN, J.